# Illinois Official Reports

## Appellate Court

***In re Marriage of Stoker*, 2021 IL App (5th) 200301**

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF DANIEL P. STOKER, Petitioner-Appellant, and ERICA L. STOKER, Respondent-Appellee. |
| District & No. | Fifth District No. 5-20-0301 |
| Rule 23 order filed Motion to publish allowed Opinion filed | July 15, 2021 <br> August 19, 2021 <br> August 19, 2021 |
| Decision Under Review | Appeal from the Circuit Court of St. Clair County, No. 18-D-324; the Hon. Stacy L. Campbell, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Daniel J. Grueninger, of Belleville, for appellant. <br><br> Charles W. Courtney Jr. and Jayni D. Lintvedt, of Courtney Clark Law, P.C., of Belleville, for appellee. |
| Panel | JUSTICE WELCH delivered the judgment of the court, with opinion. Presiding Justice Boie and Justice Wharton concurred in the judgment and opinion. |

**OPINION**

¶ 1        This is an appeal of the judgment of the circuit court of St. Clair County dissolving the marriage between the petitioner, Daniel Stoker, and the respondent, Erica Stoker. Daniel appeals the judgment of the court upholding the validity of two settlement agreements entered into between the parties after their separation. Specifically, Daniel contends that the court erred (1) in shifting the burden to him to prove the written agreements were not valid, enforceable contracts, *i.e.*, that they lacked offer, acceptance, and consideration; (2) by refusing to allow a second hearing on the contract invalidity grounds raised by him after the court found that the agreements were enforceable; (3) in finding that the written agreements were valid, enforceable agreements and entering the judgment of dissolution based on them; and (4) in denying his request to modify temporary child support and maintenance based on his voluntary change of employment. For the following reasons, we affirm.

                                                    I. BACKGROUND

¶ 2
¶ 3        On September 4, 2004, Daniel and Erica were married. They had two children, C.S., born July 2006, and L.S., born February 2012. On April 26, 2018, Daniel filed a petition to dissolve the marriage. At that time, Daniel and Erica were both 36 years old. On June 8, 2018, Erica filed an answer to the petition for dissolution of marriage, in which she stated that the parties had entered into written settlement agreements prepared by Daniel; the first agreement was titled divorce agreement between Daniel Stoker and Erica Stoker and was dated November 30, 2017, and the other agreement was dated February 17, 2018, and concerned the purchase of a new vehicle for Erica. That same day, Erica filed a counterpetition for dissolution of marriage, where she indicated that the settlement agreements resolved the issues of maintenance and child support and partially divided the marital property and requested the trial court enter a judgment in accordance with those agreements. She also filed a petition for temporary relief.

¶ 4        The November 2017 divorce agreement between the parties provided, *inter alia*, as follows: (1) Daniel would pay Erica eight years of maintenance in the amount of $9400 per month, which would continue even if Erica remarried (unless the new husband's income was higher); (2) Daniel would pay 28% of his income for child support when maintenance ended; (3) Daniel would pay for the children's college; (4) Daniel would pay for the children's braces, vehicles, and vehicles' insurance; (5) Erica would get the marital home and the equity in that home; (6) Erica would be responsible for the marital debt owed to her parents; (7) Daniel and Erica would divide the marital savings account, or Daniel would take $10,000, whichever was lower in January 2019; (8) Daniel would help with expenses for the children's extracurricular activities; (9) Daniel would not voluntarily take new employment without paying the above obligations; (10) Daniel's 401(k) would be equally split as of the date of the divorce; (11) Erica would receive one-half of Daniel's military retirement pay; (12) Erica would have sole custody of the children; and (13) Daniel would get open parenting time with the children and the ability to vacation with them as decided by him and Erica. The written agreement only had a signature line for Daniel, and it was signed by him.

¶ 5        The February 2018 written agreement provided that Daniel would assume responsibility for the loan on a 2018 Toyota Highlander, up to $361 per month for 60 months, he would have no ownership interest in the vehicle, as it was a gift to his children and Erica, and the loan and

title would be in Erica's name. This agreement was signed by Erica and Daniel and was notarized.

¶ 6    On October 10, 2018, the trial court entered a temporary order by agreement of the parties, ordering Daniel to pay Erica $9600 per month in temporary maintenance and child support and granting Daniel leave to file a declaratory action to determine the enforceability of the parties' agreements. On February 6, 2019, Daniel filed a motion to modify the temporary order, asking the court to reduce the temporary maintenance and child support awards because the written agreements were not enforceable postnuptial or settlement agreements and he had recently experienced a reduction in income due to a change of employment.

¶ 7    On April 29, 2019, Daniel filed a memorandum of law in opposition to the entry of a marital settlement agreement (MSA) based on the written agreements, denying that he had entered into the agreements. He contended that, pursuant to section 502(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/502(b) (West 2018)), the provisions regarding child support and parental responsibility allocation were not binding on the court. He argued that the remaining provisions were unconscionable, the agreements failed to identify the essential terms, such as the specific property and value to be divided and the identities of the obligor and the obligee, and the provisions in the agreements were ambiguous in that they would require parol evidence to be given meaning and effect. Daniel further argued that his signatures on the agreements were obtained by threat, coercion, and duress, which rendered them unenforceable and unconscionable. He contended that Erica drafted the agreements, presented them to him, and threatened to report him to his military commanding officer for allegedly engaging in an extramarital affair with a coworker if he refused to sign (at the time, Daniel was in the National Guard reserves). Attached to the motion was Daniel's affidavit in which he stated that he did not enter into the settlement agreements willingly, freely, or with full knowledge.

¶ 8    On June 27, 2019, the trial court held a hearing, where it heard testimony about the enforceability of the divorce agreements. Daniel admitted that, after the separation, he had multiple meetings with Erica at Starbucks and Barnes & Noble to try to determine a fair split of the assets, maintenance, and child support. On November 30, they met at Starbucks, and Erica had a list of demands; they were there for approximately two hours. He wrote out her demands while she articulated them because she was bad at spelling. The initial written agreement reflected those demands. She told him what the expenses were for the marital home and how much money she would need to stay in the house with the children. He only signed the document because she threatened to reveal his alleged affair with his coworker to his commanding officer at Tyndall Air Force Base (Tyndall). Erica said that both her and her father, who was a colonel in the Air Force, would report the affair and use their leverage to defame him and his coworker (who was currently his girlfriend) and get them fired. He believed that, if she had followed through with her threat, it would have, at a minimum, made his job more difficult and ruined his opportunities for promotion and, worst case scenario, would have gotten him fired. He explained that, within the military, adultery was a crime and commanders take it seriously. The commanders also take the morale and welfare of their units seriously and have relieved people from their duties when they felt like the morale or cohesiveness of the unit was threatened. He was not in a relationship with his current girlfriend when he signed the November agreement, but they had gone on some dates. Erica also

mentioned that her father was only staying silent because she needed Daniel to continue earning money for her and the children.

¶ 9       Directly after the meeting, he exercised his parenting time with the minor children, and when he brought them home, Erica presented him with a typed document. He read the document and told her that he did not agree with it. However, he only had about five minutes before he had to return to Tyndall, so he signed it anyway. At that time, he was not financially able to make the agreed child support and maintenance payments. He had full-time employment with Delta Airlines (Delta) as a pilot, earning approximately $156,000 annually, and earned between $20,000 and $30,000 working with the National Guard reserve. His December 31, 2017, pay stub from Delta indicated that his gross annual income was $174,611 and that Delta had made $28,609 in contributions to his 401(k) account. His 2017 military earnings statement showed that his year-to-date total wages were $32,122.73 and his year-to-date entitlements totaled $34,962. He acknowledged that he had recently taken a leave of absence from Delta and was not receiving any income from there.

¶ 10      Daniel acknowledged that he agreed to make the payments toward the purchase of a new vehicle for Erica. He went with her to the dealership to test drive the vehicle, and although he told her that they could not afford the payments, she reminded him that she had never reported his alleged affair to his commander. He eventually agreed to make the payments but told her that she could not blackmail him anymore.

¶ 11      Daniel's conversations with Erica on November 30 were not his last communications with her regarding the initial agreement. He testified about text messages he sent to Erica in which he said that he did not want to go back on what he had agreed to but that he felt like the amounts were too high and unfair and he did not want to feel as if he had been screwed. He wanted to be fair and suggested that he pay her $8000 per month, which would give him approximately $1000 per month for his living expenses. He indicated that he felt caught off guard without any research or information. He also indicated that he had talked to four friends about the support amounts, and $8000 was generous. On cross-examination he acknowledged that he had talked to other people regarding the agreement, but he claimed that he could not remember who he talked to. His text messages did not mention any of the alleged threats that Erica made against him. The text messages were entered into evidence.

¶ 12      Erica testified that she was not employed full-time; she ran a photography studio, at which her net income was less than $10,000 in 2017. After going to counseling, in the beginning of November, Daniel informed her that he wanted to end their marriage. He said that he just wanted his freedom, to keep the lawyers out of it, and to come up with a fair settlement agreement. She wanted to keep it amicable, so she agreed to meet with him on November 30 to discuss the terms of the separation. Although she knew that Daniel was having an affair at that point because he admitted it to her, she did not make any threats or show up to the meeting with a list of demands. She did not know what they would talk about at the meeting, but her intention was to discuss the children and what they would need for security.

¶ 13      During their conversation, Daniel wrote down the things that they agreed to, and he signed that handwritten document. Most of the items on the list were from Daniel, and although she had not done any research in preparation for the meeting, she did tell him what their expenses were. After the discussion, Daniel said that the handwritten agreement was not official and that they should type it up so he could sign it. Erica agreed to type it up at home while he took the children swimming. When he returned with the children, they sat down again, reviewed the

typed agreement, and discussed its terms. When asked what objections Daniel had to the agreement's provisions, she responded that he did not object to any of them, as most of them were his idea; he wanted what was fair because he loved his children, and he wanted his freedom. Before signing the agreement, Daniel read through it pretty quickly. Then, he signed it and went downstairs to play video games with their children. He did not return to Tyndall immediately but left later that day or the next morning.

¶ 14 Erica testified that Daniel knew that their expenses were between $12,000 and $13,000 per month, although they would likely decrease once they were no longer living together. They both wanted her to remain in the marital home with the children. The amount of maintenance was Daniel's idea, and he said that $9400 per month was less than one-third of what he could make just showing up to work at Delta. Erica acknowledged that the agreed amount was generous. Daniel also told Erica that there was no way that she would not get remarried, she had been a good wife but was not for him, she would likely marry a youth pastor who would not make much money, and if that happened, he wanted the children to be provided for because he had the means. He never expressed to her on November 30 that he could not make the financial commitments in the agreement, nor did he ever express concern about her threatening his employment. She acknowledged that her father was not happy about the situation between her and Daniel, but it was understood that, if Daniel lost his job, Erica and the children would be greatly affected, as Daniel would lose additional income and their healthcare benefits. She explained that she was still in love with Daniel at the time they entered into the first agreement, she knew that his military employment was his identity, and she would not have threatened to take that away from him.

¶ 15 As for the February 2018 agreement, Erica explained that it was time for her to get a new car because the van was "on its last leg" and the doors would not close. Daniel had told her they would get a new vehicle when he got his annual bonus from Delta in February. He used part of his bonus to purchase the van, but she had made the payments since. When Daniel initially prepared the agreement, he had included a provision prohibiting her from saying anything about his affair. However, she told him that was not her goal, and she just wanted to move on with her life. She denied threatening him that day to get him to sign the agreement. When asked on cross-examination why Daniel would include a provision about the affair in the agreement if she had not been threatening to reveal it, she responded that it was because Daniel knew his affair was against military code.

¶ 16 Between the signing of the two agreements, Erica noted that her communications with Daniel were very amicable, and she thought this was because he was dealing with a lot of guilt for leaving without first talking to the children and for leaving her feeling devasted. She explained that her entire goal was to get along for the children, so she did everything she could to speak respectfully and amicably to him and move forward with forgiveness.

¶ 17 The first time that Erica knew Daniel had changed his mind about the written agreements was when she received a text message from him. After receiving a second text message, she felt like Daniel did not know what he earned and that he had either been talking to his girlfriend or an attorney because what he was saying to her was nothing like what they had discussed on November 30.

¶ 18 After the testimony, the trial court announced its oral ruling on the enforceability of the written agreements. The court noted that both parties had two completely different versions of the circumstances surrounding the entry of the agreements, so its determination was based on

credibility. The court noted that Daniel had first testified on direct examination that he made $156,000 from Delta and between $20,000 and $30,000 from his reserve pay. However, the court noted that he then admitted on cross-examination that he actually made $174,611 from Delta and almost $35,000 from the reserves. The court found that this information was pertinent to whether Daniel had enough money to enter into the contract, and it was concerned about the inconsistent testimony. The court then found that Daniel's text messages indicated that he had experienced buyer's remorse and that it was likely that he went and talked to some people, potentially did his own research, and learned that a court likely would not have awarded that much money in both maintenance and child support. Based on the credibility of the witnesses, the issues with Daniel's testimony about his income, the interpretation of the text messages, and the lack of any text messages pertaining to any alleged coercion or duress, the court found that Daniel failed to meet his burden of proving that he only entered into the written agreements as a result of coercion or duress. As for unconscionability, the court found that the agreements were not unconscionable where the parties voluntarily agreed to a temporary order in which the support amounts that Daniel agreed to pay were actually higher than the amounts that he agreed to pay pursuant to the November 2017 agreement. However, the court cautioned that there may be specific terms that it might not enforce, and they would get to that, but the contract as a whole was not unconscionable.

¶ 19    That same day, the trial court entered a written order in which it indicated that it issued an oral ruling that would be reduced to writing and ordered the parties to submit a parenting plan.

¶ 20    On October 29, 2019, Daniel filed a motion for declaratory judgment, asking for a declaration that the November 2017 written agreement was invalid and not binding on the parties. In the motion, Daniel contended that the written agreement lacked the requirements for a valid contract, as there was no offer, in that the terms were vague and ambiguous and they failed to state an offer with sufficient clarity, which could not be cured with parol evidence. Daniel also argued that there was no acceptance because Erica never signed the agreement or provided any other evidence of timely written acceptance and there was no consideration given by Erica in exchange for his promises.

¶ 21    On November 5, 2019, Erica filed a motion for entry of a judgment, asking the trial court to enter an order setting the parenting plan and a judgment for dissolution of marriage in accordance with its previous rulings.

¶ 22    On December 10, 2019, Daniel filed a motion to reopen proofs, obtain ruling, and other relief, requesting that the trial court allow the presentation of additional evidence on the validity of the written agreements or, in the alternative, enter a ruling that the agreements were invalid postnuptial agreements. In the motion, Daniel contended that he had a valid defense to the entry of the initial agreement in that it lacked acceptance and consideration and was merely a unilateral promise. He argued that the June 2019 hearing was not a hearing on all matters concerning the validity of the agreements; alternatively, he argued the hearing was on all matters but that the trial court did not rule on the validity of the agreements and had heard no evidence on this issue. He also requested that the court hold a hearing or, in the alternative, render a ruling on his motion to modify maintenance and child support.

¶ 23    On December 17, 2019, Erica filed a motion to strike Daniel's motion for declaratory judgment, arguing that the issue of the validity and enforceability of the written agreements had previously been decided by the trial court (the ruling was entered five months before

Daniel filed his motion for declaratory judgment) and that Daniel was barred by *res judicata* from bringing a second action on this same issue.

¶ 24 On December 20, 2019, the trial court entered a judgment of allocation of parental responsibilities, which included setting out a parenting time schedule.

¶ 25 On March 12, 2020, the trial court held a hearing on a continuation of all remaining issues. The court commenced by first hearing arguments on Daniel's motion to reopen proofs on the issue of the validity of the written agreements. Prior to arguments, the court explained that, when the June 2019 hearing was commenced, the court and counsel for both parties discussed how to proceed in the matter. The court stated that, because a declaratory judgment action was not filed, it made sense to begin the hearing by deciding whether the agreements were enforceable and counsel did not object to that plan. The court noted that the argument that Daniel presented was that the agreements were unconscionable because of coercion and duress; the court stated that those were the only reasons given as to why the agreements should not be enforced. The court further stated that Daniel's motion to reopen proofs raised new theories as to why the agreements were not valid and that those arguments were not made at the previous hearing. The court explained that its understanding of why the case did not go forward with the rest of the issues that day was because most, if not all, of the remaining issues could be resolved without further court action; in support, the court noted that a parenting plan had been entered following that hearing. However, it explained that not all of the issues were able to be resolved after that hearing.

¶ 26 The trial court then addressed Daniel's counsel and stated that the only way it would allow him to reopen proofs on an already litigated issue was if there were new facts to present between the previous hearing and that day. In response, Daniel's counsel contended that the previous hearing was not a hearing on every issue regarding the validity and enforceability of the agreements; the hearing was limited to the issue of unconscionability; the court never determined whether the agreements were valid contracts, *i.e.*, whether there was offer, acceptance, and consideration; and the court did not need to hear arguments on those issues because it could just look to the four corners of the documents to determine validity. The court then responded that it had given both sides an opportunity to present arguments on the enforceability of the agreements and that the only arguments that Daniel made were that they were unconscionable due to coercion and duress. After hearing further argument, the court found that Daniel had an opportunity to present every basis on which he was objecting to the validity and enforceability of the written agreements at the June 2019 hearing. Thus, the court granted Erica's motion to strike Daniel's motion for declaratory judgment. Daniel then made a formal offer of proof.

¶ 27 Pursuant to the offer of proof, Daniel's counsel elicited testimony from Erica that she typed the November 2017 agreement after Daniel had written it out and that its terms were the result of discussions between her and Daniel based off what he knew to be his income, what was fair to the children, what would avoid litigation, and what would give Daniel his freedom. Erica stated they agreed, as a married couple of almost 15 years, that those particular terms would be appropriate. In response to a question about whether there were any provisions in the agreement where she agreed to give Daniel something, she responded that Daniel agreed to give her the house, so that he could walk away and live with his girlfriend, and she agreed to be responsible for the mortgage on the home after January 1, 2019. She also agreed that she would be responsible for the $38,000 loan owed to her parents. As for the maintenance

provision, she stated that it was something they decided after discussing how much Daniel could make at Delta and his income from the reserves. Erica acknowledged that she asked for the provision prohibiting Daniel from obtaining new employment without first paying the support amounts because she thought it would be inappropriate for him to quit any of his jobs without paying what he agreed to. When asked what else she had promised to give under the agreement, she responded that she had given Daniel 15 years of dedication and that there was not much else for her to give him besides his freedom. She explained that there was nothing more for her to give because she had already given up her degree and Daniel indicated that he only wanted his freedom and to leave with some dignity after his affair. They entered into the agreements to avoid any court proceedings, and with the little legal knowledge they had, they did the best they could. She did not believe that she needed to sign the first agreement because it was based off what Daniel wanted, him moving forward in his new chapter of his life and her being able to move forward with some security. At the time they entered into the agreements, she did not think that he would change his mind.

¶ 28 In contrast, Daniel testified that all of the provisions of the November 2017 agreement were Erica's idea, she calculated $9400 per month for maintenance, and the only thing he asked of her was to take the debt that was owed to her parents. However, he acknowledged he had some input in the agreed-upon maintenance amount. At the time of their discussion, he asked Erica to change some of the provisions that he did not agree with, but she responded that those items were just a "starting point." He did not know why Erica did not sign the first agreement. The offer of proof was then concluded, and the hearing on all remaining issues commenced.

¶ 29 Erica was brought back up to the stand and testified as follows. She was 38 years old and had an associate's degree for radiology. However, she never worked in radiology and did not keep up with the continuing education requirements because Daniel did not want her to work and they moved around during their marriage since he was in the military. She was self-employed working as a photographer and had been a photographer on and off since 2013. As of March 5, 2020, her gross income was approximately $616 per month and, after expenses, she took home approximately 30% of that. She explained that she had a difficult time growing her business since they moved from Savannah, Georgia, to O'Fallon, Illinois, in late 2015 and because of the time that she devoted to the divorce proceedings and being the sole caretaker for the children. Every time they moved, she had to reestablish her business. Given her pricing structure and her schedule as a single mother, she hoped to have at least one client every week or every two weeks, but in photography, there were some seasons where she would not have any clients. She had not sought out other employment because she did not qualify for anything earning more than minimum wage and she had the potential to earn more if she focused on growing her photography business and was able to devote more time to that. She was severely dyslexic, so it took her significantly more time to fill out financial documents.

¶ 30 The loan that was owed to her parents had not been paid since June 2018 because Daniel stopped making the payments; they had agreed to pay her parents $1000 per month until the loan was paid in full. They had entered into a written agreement with her parents with regard to the terms of the loan, and the agreement was admitted into evidence.

¶ 31 Daniel was active-duty military until 2015 and then went to work for Delta as a pilot. They had just built a house and knew the children were not getting any cheaper, and this gave him more time to spend with them and also more income. Prior to their separation, Erica and Daniel had numerous discussions about Daniel's desire to continue flying military aircraft, and he was

able to do so in the reserves. He previously told her that he would choose flying military aircraft over her and the children. In 2019, he quit his job at Delta and accepted a full-time job with the National Guard flying military aircraft. She was surprised by his decision because it was a decrease in his income and he was on a new career path with Delta. At Delta, he worked 15 days per month, he had more time to spend with the children, he could make $300,000 within a short period of time, and he could also still fly military aircraft the first week of every month with the reserves.

¶ 32    Erica testified that Daniel barely exercised his parenting time with the children in 2019 and that his time with the children had not increased since he quit flying for Delta. Excluding Christmas, when he had the children for eight days, he only had them for four overnights. He had one visit in March 2020, but there was not another one planned because he canceled the next visit after they had a confrontation at her house. Daniel's inability or refusal to spend time with the children impacted her ability to earn a living. In October 2018, Daniel was ordered to pay $9600 per month to her for support, but she never received the full amount from him. From February 6, 2020, through the present, the only payments that she received were as follows: $3215 in February, $2500 in March, and another $41 in March. Delta paid out profit-sharing every year in February, and in February 2020, Daniel received a check for $23,012.

¶ 33    Daniel testified that he and Erica had two children, C.S., who was 13 years old, and L.S., who was 8 years old. In May 2003, he was on active duty in the Air Force as an instructor pilot. He married Erica approximately nine months later. From 2009 until 2012, he was a fighter pilot stationed in Japan. Erica lived there with him. After that, he was assigned to Savannah, Georgia, in the Army Ranger Unit. They lived there until March 2015. He then started looking for different assignments besides active-duty Air Force because he wanted to fly F-16s or F-15s (military fighter aircraft). Although he accepted a job with Delta as a pilot in March 2015, he explained that the job was a placeholder to "get back in the fighter community" and he could not find employment as a fighter pilot at the time. The job with Delta was a great opportunity because the company was mainly based on seniority; he could start there, take a leave of absence to fly for the National Guard, continue to accrue seniority with Delta while completing full military retirement, and then finish his career at Delta with a higher seniority after he retired from the military. He explained that service members working with a civilian organization were able to take time off without penalty while doing military service; he was allowed to return to his civilian employment without penalty with regard to pay and years of service. Erica supported his decision to accept the job with Delta. When he left active duty in 2015, he had 12 years and 6 months of military service and had 7½ years until he was eligible for full retirement benefits. Based on this, he thought that he could work toward a 20-year retirement with the military while being employed with Delta. He also worked part-time with the Army Reserves in Tyndall.

¶ 34    From March 2015 until he found new full-time employment with the military in 2019, he continued applying for different jobs in various guard units. In 2016, he was offered employment at Whiteman Air Force Base in Missouri, but his desire to fly military aircraft had been a source of contention between him and Erica throughout their marriage. In April 2019, he left his employment with Delta and obtained full-time employment as a fighter pilot because he wanted full retirement with the military; the Tyndall base was destroyed by a hurricane in October 2018, so he was unable to fly in the reserves there; he wanted to fly an operational fighter; and at Delta, he was the most junior captain and was the last to pick his monthly

schedule, so he had to work the majority of the weekends and holidays and got the worst trip sets.

¶ 35    Daniel's pay statement from Delta on December 31, 2017, showed that his total year gross income was $174,611, and Delta contributed an additional $28,609 to his 401(k) that year. His 2017 year-end earnings statement from the reserves showed his total entitlements were $34,962. He also received an additional $7832 in consulting income. In January 2018, he became a captain at Delta, and his pay increased. In 2018, he worked an average of 23 to 25 days per month. Based on a demonstrative exhibit that he presented to the trial court, he represented that his total income for 2018 was $263,002.79, but he acknowledged that, with Delta's 401(k) matching, his total income was approximately $300,000. His 2019 income included income from Delta through May, which included his profit-sharing payment, and his new employment as a fighter pilot. As of April 30, 2019, around the time that he left Delta, his year-to-date base pay was $75,217, he received $28,039 in profit-sharing, and he received $16,783 in 401(k) contributions. He received $72,097 from his new full-time position with the National Guard and approximately $5000 from his consulting work. In 2020, he still received the profit-sharing from Delta and was paid $40,675. He also earned $147,020 from the National Guard.

¶ 36    Daniel agreed that he had three overnights with the children in February 2019, one overnight in April 2019, one overnight in June 2019, and eight days at Christmas. Other than paying for the children's insurance, he had not paid any of their out-of-pocket medical bills. He signed the initial agreement between himself and Erica knowing that he would not be able to afford the amount of support; he anticipated being promoted to a captain at Delta, and the support amount was based on captain pay rates.

¶ 37    After the hearing, that same day, the trial court entered a written order, *inter alia*, requiring the parties to submit written judgments and arguments by March 26, 2020, and striking Daniel's motion for declaratory judgment.

¶ 38    On June 10, 2020, the trial court entered a judgment of dissolution of marriage where it discussed the enforceability of the written agreements. The court noted that it was required to discuss the enforceability of the agreements under section 502(b) of the Act (750 ILCS 5/502(b) (West 2018)), which provided that any provision in the agreement, except for those providing for support and allocating parental responsibility, would be binding on the court unless it found that the agreement was unconscionable. The court also noted that it was Daniel's burden to prove that he was subject to coercion and duress, and it had previously ruled on this issue, but it was going to elaborate on that ruling. With regard to coercion, the court noted that the parties met at Starbucks for two hours to discuss the initial agreement and then, after the meeting and upon Daniel's request, Erica prepared a comprehensive typewritten version of the agreement that the parties discussed and Daniel signed it. Then, in February 2018, Daniel signed an additional agreement regarding the purchase of a new vehicle for Erica. Having considered the testimony, the credibility of the parties, and the text messages between the parties, the court found that Daniel failed to meet his burden to demonstrate that the written agreements were unconscionable based upon coercion and duress at the time of their execution.

¶ 39    The trial court also noted that it must consider the economic positions of both parties immediately following the execution of the agreements and determine whether the agreed monthly amount of $9400 for support was unconscionable based on what those obligations would have been if calculated from the parties' 2017 income. Based on the calculations

provided by Daniel, monthly maintenance would have been $5220.54, and child support would have been $1869 per month, for a total of $7089.54. The court noted that Daniel instead agreed to pay $7531 per month in maintenance and found that the increase of $2310.46 was not unconscionable. The court further found that Daniel reaffirmed his willingness to pay that amount when he agreed to the October 2018 temporary order, in which he was ordered to pay $9600 per month in unallocated support, and he was financially able to pay that amount until he became voluntarily underemployed. Thus, the court found that the November 2017 and February 2018 agreements were enforceable.

¶ 40 The trial court then set out the provisions for maintenance, child support, property distribution, and allocated parental responsibilities. The court ordered, *inter alia*, Daniel to pay maintenance in the amount of $6810 per month for eight years, found that the maintenance award was modifiable pursuant to the terms of section 504 of the Act (*id.* § 504) on any basis other than a reduction in Daniel's income caused by his voluntary leave from his employment with Delta, ordered Daniel to pay child support in the amount of $2590 per month, awarded Erica the marital home with her being solely responsible for the mortgage payment on the residence, ordered Erica solely responsible for the debt owed to her parents, and ordered Daniel to pay Erica $361 per month for 60 months toward the Toyota Highlander payments.

¶ 41 Also in the judgment, the trial court denied Daniel's motion to modify the temporary order based on his change of employment. The court noted that, at the time of the entry of the temporary order, Daniel was employed by the United States Air Force Reserve and Delta Airlines as a pilot, his 2017 annual income was $208,821.58, his 2018 annual income was $263,002.79, and his earnings were almost $60,400 more when he filed his motion to modify than when the divorce agreement was entered. The court noted that it heard the following testimony about Daniel's change of employment: the change was purely voluntary as he chose to take a leave from Delta and commence employment on a full-time basis with the Massachusetts Air National Guard, he was aware of the temporary support order that ordered him to pay $9600 per month to Erica, and he was also aware that he signed the agreement committing to pay $9400 per month to Erica regardless of any change in active-duty status or voluntary change in employment. Having considered the parties' testimony and the credibility of the witnesses, the court found that Daniel's change of employment was voluntary and that he was unreasonably failing to take advantage of an employment opportunity at Delta. The court noted that this was not a case where it was required to speculate as to a party's motivation in changing employment because Daniel admitted on cross-examination that he told Erica that he would choose flying jets over her and the children any day, and he followed through on this threat by voluntarily reducing his income.

¶ 42 On July 7, 2020, Daniel filed a motion to reconsider the trial court's finding that the written agreements were enforceable, arguing they lacked acceptance and consideration and that the court had not heard any evidence relating to the validity of the agreements as binding, postnuptial agreements. On August 12, 2020, the court entered an order denying Daniel's motion with regard to the validity of the written agreements. Daniel then filed a notice of appeal. After filing the notice of appeal, Daniel filed, in the trial court, another petition to modify maintenance and child support because he returned to his former employment with Delta and, due to wage reductions and cutbacks, his income had substantially reduced.

¶ 43                                  II. ANALYSIS

¶ 44          A. The Validity and Enforceability of the Written Settlement Agreements

¶ 45       Daniel first contends that the trial court improperly shifted the burden of proving that the written agreements were valid, enforceable contracts to him. Specifically, he contends that Erica failed to prove that the written agreements were valid contracts in that there was no acceptance on her part and no consideration given by her in exchange for Daniel's promises. Alternatively, Daniel argues that the court erred in finding that the written agreements were valid and enforceable.

¶ 46       It is well settled that Illinois law favors the amicable settlement of property rights in cases of marital dissolution. *In re Marriage of Lorton*, 203 Ill. App. 3d 823, 825 (1990). To promote the amicable settlement of disputes between parties in a divorce action, the Act provides that parties may enter into an agreement containing provisions for disposition of their property, maintenance, support, and parental responsibility allocation. 750 ILCS 5/502(a) (West 2018). The terms of the settlement agreement, except for those providing for support and parental responsibility allocation, are binding on the court unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties, that the agreement is unconscionable. *Id.* § 502(b). Thus, settlement agreements are binding absent a finding of unconscionability. *In re Marriage of Wig*, 2020 IL App (2d) 190929, ¶ 19. "If the parties decide to settle their property rights by mutual agreement rather than by statute, they are bound to the terms of their agreement." *In re Marriage of McLauchlan*, 2012 IL App (1st) 102114, ¶ 21.

¶ 47       The terms of the settlement agreement are subject to the rules of construction for contracts, and the burden rests on the party asserting the agreement to establish its existence by clear and convincing evidence. *Lorton*, 203 Ill. App. 3d at 826; *In re Marriage of Doermer*, 2011 IL App (1st) 101567, ¶ 27. For the agreement to be enforceable, the material terms must be definite and certain, so that the trial court can determine from the terms and provisions, under the rules of construction and applicable principles of equity, what the parties have agreed to do. *In re Marriage of Haller*, 2012 IL App (5th) 110478, ¶ 26. Property settlement agreements, which have been assented to by both parties, may not be cancelled solely because one party withdraws his assent prior to the entry of the judgment; a settlement agreement should not be disregarded simply because one party has second thoughts. *Id.* ¶ 44. Where the contents of the agreement are testified to and the objecting party fails to object or to give evidence to the contrary, the agreement is established. *Id.*

¶ 48       The determination of whether a valid settlement agreement occurred is in the discretion of the trial court, and its decision will not be reversed unless the court's conclusion is against the manifest weight of the evidence. *In re Marriage of Baecker*, 2012 IL App (3d) 110660, ¶ 25.

¶ 49                          1. *Establishing the Existence of the Agreements*

¶ 50       Here, we note at the outset that Erica, as the party asserting the agreements, had the initial burden of establishing the existence of those agreements by clear and convincing evidence. We find that Erica has met that burden. Erica first asserted the existence of the two written agreements in her petition for dissolution of marriage, and then she attached those written agreements to her counterpetition for dissolution of marriage. The first agreement set forth various provisions relating to maintenance, the marital residence, custody, parenting time, the marital debt, child support, and other child-care-related expenses. This agreement was typed

up by Erica and signed by Daniel. The second agreement dealt with the purchase of a new vehicle for Erica and the children, and both parties signed it. In his filings with the trial court, Daniel essentially acknowledged the existence of the two agreements but disputed their validity and enforceability. Thus, we find that Erica has satisfied her burden of proving the existence of the written agreements by clear and convincing evidence.

¶ 51                          2. *Acceptance and Consideration*

¶ 52                                a. Forfeiture

¶ 53    Although Daniel challenged the enforceability of the written agreements prior to the trial court's ruling that the agreements were enforceable, he did not argue lack of acceptance and consideration until after the hearing and after that ruling. After Daniel initially challenged the enforceability of the written agreements, the court gave him leave to file an action for declaratory judgment. Even though he did not file a declaratory judgment action before the June 2019 hearing on all remaining issues, he did set forth his arguments concerning the enforceability of the agreements in his subsequent pleadings. In his April 19, 2019, memorandum of law in opposition of the entry of the purported MSA, he contended that the agreements were contrary to public policy as they affected child custody, visitation, and child support; they were unenforceable as they were unconscionable; there was no meeting of the minds because the agreements failed to recite essential terms; the agreements' provisions were ambiguous; and he was forced to enter into the agreements by coercion and duress. Then, in his position statement filed prior to the hearing on all remaining issues, Daniel asked the court to make a determination that the agreements were unenforceable.

¶ 54    During the June 27, 2019, hearing, the trial court allowed each party to present evidence as to the enforceability of the written agreements; the testimony presented focused on unconscionability and duress. After hearing the evidence, the court stated as follows:

> "This court, as petitioner's counsel said for the record in the beginning of this case, the court decided that it would first decide on the enforceability of the contract that was signed by the petitioner on November 30th of 2017. And so that's what this court is prepared to make a ruling on. It would be the enforceability of that contract as well as the enforceability of the second contract."

At this point, neither party objected or expressed any other understanding as to the procedure and purpose of the hearing. The court then announced its oral finding that the agreements as a whole were enforceable and issued a written order reiterating its findings. Because the parties focused on unconscionability and duress, the court's findings also focused on these issues. In the written order, the court noted that there was evidence taken on the declaratory judgment,[1] it had issued an oral ruling that was reduced to writing, and it announced that the parenting order was to be submitted. Again, Daniel did not indicate that he was under the impression that the issue on the enforceability of the agreements had not been fully resolved at this point. It was not until four months after the court entered its order finding that the agreements were valid and enforceable that Daniel argued that the agreements were not valid contracts, *i.e.*, that they lacked acceptance and consideration. At this point, Daniel had obtained new counsel, and

---

[1]At this point, a motion for declaratory judgment had not been filed, but the trial court determined, and the parties agreed, that it was necessary to determine the enforceability of the written agreements.

Erica had requested entry of her proposed judgment for dissolution of marriage based on the court's previous rulings.

¶ 55 At the March 2020 hearing on all remaining issues, including Daniel's motions seeking to reopen proofs and for declaratory judgment, the trial court explained that, when the June 2019 hearing commenced, the court and counsel for both parties discussed how to proceed in the matter. The court indicated that it made sense to begin by deciding whether the agreements were enforceable. The court stated that both parties presented evidence on the enforceability of the agreements, and the only argument presented by Daniel was unconscionability due to coercion and duress. The court indicated that its understanding of why the case did not proceed with the rest of the issues set that day was because, once it found the agreements between the parties enforceable, most, if not all, of the remaining issues could be determined without further court action. The court even noted that a parenting plan had been entered following that hearing. Although Daniel's counsel argued that it was understood that the June 2019 hearing would not fully resolve the issue of the validity and enforceability of the agreements, the court disagreed. The court concluded that Daniel had an opportunity to present every basis on which he was objecting to the written agreements at the hearing. In rejecting Daniel's attempt to raise these arguments after the previous ruling, the court pointed out that these issues were "new theories" that he could have raised in the eight months between him being granted leave to file a declaratory judgment action and the hearing on the enforceability of the agreements and, further, could have presented argument and evidence on those issues at the actual hearing. We agree with the trial court.

¶ 56 In *In re Marriage of Heinrich*, 2014 IL App (2d) 121333, ¶ 62, the Second District held that, where a party only raises a specific argument objecting to the validity of an agreement after hearing, on declaratory judgment, arguments concerning the validity and enforceability of that agreement, the party forfeits that argument. There, respondent only raised the argument that he was forced to enter into the parties' premarital agreement by coercion, which made the agreement unconscionable, in his motion to reconsider. *Id.* Similarly, Daniel failed to raise his arguments concerning acceptance and consideration until after the hearing was held on the validity and enforceability of the agreements and after the court made its decision. At the June 2019 hearing, the parties had ample time to present all their evidence and arguments as to the validity and enforceability of the agreements, which included any challenge to a lack of acceptance and consideration. There was no indication in the record that the parties could only present their arguments on unconscionability and could not challenge the validity of the agreements. There was also no indication in the record that this hearing would not fully resolve the matter. Thus, we find that Daniel has forfeited any further challenge to the validity and/or enforceability of the written agreements entered between the parties because he failed to make those arguments in the trial court.

¶ 57 b. Subsequent Hearing on the Validity of the Agreements

¶ 58 Alternatively, Daniel contends that the trial court erred in refusing to rule or to allow a second hearing on the contract invalidity grounds that he raised in his motion for declaratory judgment. Daniel argues that he specifically pled that the written agreements were invalid and unenforceable in his memorandum of law filed in opposition of entry of the MSA, which was filed before the June 2019 hearing; he reiterated the "more specific bases" for why the agreements were unenforceable in his motion for declaratory judgment; it was clear that the

June 2019 hearing was not a hearing on all of the issues regarding the enforceability of the agreements and instead was focused on the narrow issue of unconscionability; and the court never ruled on whether there was acceptance and consideration, which were required for a valid contract.

¶ 59 The essential requirements of a declaratory judgment action are (1) a plaintiff with a legal tangible interest, (2) a defendant having an opposing interest, and (3) an actual controversy between the parties concerning such interests. *The Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶ 26. An actual controversy means a concrete dispute admitting an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof. *Id.* At the time that Daniel filed his motion to reopen proofs and motion for declaratory judgment, the issues involving the validity and enforceability of the written agreements were already decided. Thus, Daniel did not seek a declaration as to an actual controversy, as any declaration on an already decided issue would do nothing to aid in the termination of a controversy or some part thereof. See *id.* ¶ 28 (plaintiff's action did not seek a declaration as to an actual controversy, as such a declaration would do nothing to aid in the termination of the controversy or some part thereof, as that question had already been settled). Accordingly, we find that the court did not err in refusing to reopen the proofs and allow him a second attempt to challenge the validity of the written agreements.

¶ 60                    c. The Existence of Acceptance and Consideration

¶ 61 Notwithstanding forfeiture, we find that the testimony provided at the June 2019 hearing indicated that there was acceptance and consideration when the parties entered into the written agreements. The basic requirements of a contract are offer, acceptance, and consideration. *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 770 (2007). Consideration is a bargained-for exchange of promises or performance. *Id.* An act or promise that benefits one party or is detrimental to the other party is sufficient consideration. *Id.* Whether a contract contains consideration is a question of law that we review *de novo. Id.*

¶ 62 First, although Daniel contends there was no acceptance because Erica did not sign the initial agreement, we find that there was ample evidence in the testimony presented at the hearing indicating that she accepted the written agreements. At the June 2019 hearing, Erica's unrebutted testimony was that Daniel wanted to end their almost 15-year marriage, he wanted his freedom, and they wanted to keep the lawyers and the court out of it, so they engaged in several discussions to come to an amicable divorce agreement, which would fairly split the assets and figure maintenance and child support. Daniel acknowledged that these conversations occurred. Erica explained that she wanted to keep their interactions amicable and that she believed that Daniel felt guilty for leaving his family and for her resulting devastation.

¶ 63 The parties spent two hours at Starbucks coming to the terms outlined in the November 2017 agreement; they agreed that it was originally handwritten by Daniel, but then Erica took the document home and typed it up, and it was signed by Daniel. Although Erica did not sign the agreement, she testified that she thought Daniel was the only one that needed to sign it. As for the specific provisions in the agreement, Erica indicated that most of the items were Daniel's ideas based on what he thought was fair and considering his salary, the parties' expenses, and the children's ages. They agreed that she should remain in the marital residence

with the children, the agreed maintenance amount was less than one-third of what Daniel could make by just showing up to work at Delta, and Daniel wanted to provide for his children.

¶ 64     Regarding the subsequent agreement, which was signed by both parties, Erica testified that they needed a new vehicle because their van was on its last leg. They had discussed purchasing a new vehicle for some time, Daniel had said that he could use his annual profit-sharing bonus from Delta, which would cover a lot of the purchase price, and he agreed to purchase the vehicle for the children.

¶ 65     Moreover, we find that Daniel's argument that Erica offered no consideration in exchange for his promises is unpersuasive. In coming to an agreement to resolve their impending divorce, the parties would be able to maintain an amicable relationship, Daniel could ensure that the children were taken care of and had security, and the parties would avoid litigation and the cost of attorney fees while Daniel obtained the freedom that he desired. Also, the specific provisions of the agreements showed that Erica provided consideration in exchange for Daniel's promises, as obligations were assigned and certain property was awarded to each party. For instance, Daniel was obligated to pay $9400 per month in maintenance for eight years; to pay for the children's post-high-school educational expenses; to pay for the children's braces, cars, and car insurance; and to make the car payments on the new vehicle. Daniel was also obligated to contribute toward the cost of certain field trips and extracurricular activities for the children, and Erica was responsible for the remaining expenses. Child support was reserved until after the conclusion of the maintenance payments. Although Erica received the marital residence, she was responsible for the mortgage debt and the $38,000 marital debt owed to her parents. Daniel's retirement accounts and military retirement were to be split equally. While Erica received "sole custody" of the children, Daniel was awarded open parenting time to be exercised at his discretion.

¶ 66     Further, we find unpersuasive Daniel's argument that the debt owed to Erica's parents was not consideration. Although we acknowledge that a transfer from a parent to a child is presumed to be a gift, that presumption is rebuttable and may be overcome by clear and convincing evidence to the contrary. *In re Marriage of Didier*, 318 Ill. App. 3d 253, 258 (2000). Erica presented a copy of the loan agreement between her and Daniel and her parents that was executed on June 1, 2015, and signed by both parties and both of Erica's parents. The purpose of the loan was to finish the basement in their newly built home. Erica also presented a record of payments made by Daniel pursuant to the terms of that agreement; Daniel agreed that he made those payments. Erica had been unable to continue making those payments after Daniel stopped because he had also ceased making his court-ordered child support payment. Thus, based on this evidence, the presumption of a gift was overcome with clear and convincing evidence that the debt was a loan from Erica's parents to the parties that was made during their marriage.

¶ 67     Accordingly, the record indicates that the parties came together to reach an amicable divorce settlement that would avoid unnecessary litigation, provide security to their minor children, and give Daniel the freedom that he sought. In the agreements, the parties each made certain concessions and contemplated a mutual release of marital property rights to determine what was fair to them. See *In re Estate of Brosseau*, 176 Ill. App. 3d 450, 453 (1988) (a mutual release of property rights by a husband and wife is adequate consideration to support a settlement agreement). Thus, even though Daniel never objected to the alleged acceptance and/or consideration of the agreements at the June 2019 hearing, Erica still presented sufficient

evidence to demonstrate that it existed.

¶ 68                                  B. Unconscionability

¶ 69        A settlement agreement will only be set aside if procured by fraud or coercion or if contrary to any rule of law, public policy, or morals. *Lorton*, 203 Ill. App. 3d at 825. The party asserting duress or coercion must prove the allegation by clear and convincing evidence. *In re Marriage of Smith*, 164 Ill. App. 3d 1011, 1017 (1987); *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d 209, 215 (1994). When determining whether the agreement was unconscionable, the trial court assesses the facts existing immediately after the agreement is made. *Wig*, 2020 IL App (2d) 190929, ¶ 19. A settlement agreement is unconscionable where there is an absence of meaningful choice on the part of one of the parties combined with contract terms that are unreasonably favorable to the other party. *Baecker*, 2012 IL App (3d) 110660, ¶ 41. To determine whether an agreement is unconscionable, the court must consider (1) the conditions under which the agreement was made and (2) the economic circumstances of the parties that result from the agreement. *Wig*, 2020 IL App (2d) 190929, ¶ 19. Duress can make a settlement agreement between spouses unconscionable. *Baecker*, 2012 IL App (3d) 110660, ¶ 41.

¶ 70        In assessing whether the written agreements were unconscionable, the trial court considered the circumstances surrounding the entry of the agreements and the economic circumstances of both parties. As previously noted, the parties met at Starbucks for two hours to discuss the initial agreement, Erica typed up the handwritten agreement at Daniel's request, Daniel signed that typed agreement, and Daniel also signed the subsequent agreement. Noting that both parties had two completely different versions of the circumstances surrounding the entry of the two agreements, the court indicated that its determination was based on credibility. Pointing to Daniel's inconsistent testimony about his income and the text messages he sent to Erica, which indicated that he was suffering from buyer's remorse, the court concluded that Erica's version of events was more credible. The court found it likely that Daniel talked to some people, potentially a lawyer, about the agreements and discovered that a court likely would not have ordered him to pay that much money for maintenance and child support. It is well established that credibility determinations should be left to the trial court, as it is in the best position to observe the personalities and temperaments of the parties and assess their relative credibility when there is conflicting testimony on issues of fact. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21. As the court's credibility determination was not against the manifest weight of the evidence or an abuse of discretion, we will not overturn it. See *id.* (a trial court's credibility determination should only be overturned if it is against the manifest weight of the evidence or an abuse of discretion).

¶ 71        As for the economic position of the parties immediately following the agreements, Daniel's annual income in 2017 from Delta was $174,611 and almost $35,000 from the reserves, while Erica was self-employed, earning less than $10,000 annually in 2017. Although she had a degree in radiology, she did not work in that field and did not keep up with her continuing education because Daniel did not want her working during their marriage. While Daniel was active-duty military, they moved around, which made it difficult for Erica to establish a thriving photography business.

¶ 72        In the judgment for dissolution of marriage, the trial court noted that, pursuant to the calculations provided by Daniel, monthly maintenance would have been $5220.54 and child support would have been $1869 per month, for a total of $7089.54. However, Daniel agreed to

instead pay $7531 per month in maintenance. The court determined that the increase of $2310.46 was not unconscionable. The court also determined that Daniel reaffirmed his willingness to pay that amount when he agreed to the October 2018 temporary order, in which he was ordered to pay $9600 per month in unallocated support. The court found that Daniel was financially able to pay that amount until he became voluntarily underemployed. Thus, having considered the testimony, the credibility of the parties, and the interpretation of the text messages between the parties, the court found that Daniel failed to meet his burden of proof to demonstrate that the written agreements were unconscionable. After a careful consideration of the record before us, which includes the trial court's thorough review of the evidence presented, we are unconvinced by Daniel's argument that the written agreements were unconscionable.

¶ 73                              C. Motion to Modify

¶ 74    Lastly, Daniel contends that the trial court erred in denying his request to modify child support and maintenance based on his voluntary change of employment.

¶ 75    Section 510 of the Act provides that support orders may be modified only upon a showing of a substantial change in circumstances. 750 ILCS 5/510(a-5) (West 2018). The party seeking modification has the burden of proving a substantial change in circumstances. *In re Marriage of Saracco*, 2014 IL App (3d) 130741, ¶ 13. A voluntary change of employment resulting in diminished financial status may constitute a substantial change in circumstances if undertaken in good faith. *In re Marriage of Barnard*, 283 Ill. App. 3d 366, 369 (1996). In determining whether a voluntary change of employment is in good faith, the trial court looks at whether the change was driven by a desire to evade financial responsibility for supporting the children. *Id.* Section 505(a)(3.2) of the Act, which does not include the good-faith consideration, states that if a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income. 750 ILCS 5/505(a)(3.2) (West 2018).

¶ 76    The ability of the maintenance-paying spouse to contribute to the other spouse's support can be properly determined by considering both the paying spouse's current and future ability to pay ongoing maintenance. *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 30. The trial court considers the level at which the spouse is able to contribute, not merely the level at which he is willing to work. *Id.* When imputing income, a court must find one of the following: (1) the payor has become voluntarily unemployed, (2) the payor is attempting to evade a support obligation, or (3) the payor has unreasonably failed to take advantage of an employment opportunity. *Id.*

¶ 77    Considerable discretion is placed in the trial court in support modification proceedings, and generally the court's order will not be disturbed on review absent an abuse of discretion. *Cohn v. Cohn*, 122 Ill. App. 3d 763, 765 (1984). An abuse of discretion occurs where no reasonable person would take the view adopted by the trial court. *In re Marriage of Deike*, 381 Ill. App. 3d 620, 630 (2008).

¶ 78    Here, it was Daniel's burden, as the moving party, to establish that a substantial change in circumstances occurred. In determining whether a substantial change of circumstances occurred, the trial court looked at the time period between October 2018, when Daniel agreed to pay $9600 per month to Erica, and February 2019, when he filed his request to modify support. Daniel acknowledged that his change of employment was based on his voluntary decision to take leave from his employment at Delta and return to full-time employment with the Air Force, so he could fly fighter planes. He testified that, by taking a leave of absence with

Delta in April 2019, he would be eligible for retirement with the military sooner, have weekends off, have more time to spend with the children, and have better health benefits for the children. However, he acknowledged that his hiatus with Delta would end, and he would resume receipt of his full-time income from Delta around the time that his maintenance obligation to Erica would end. He also testified that he was 5 years and 10 months away from full retirement with the military, acknowledged that he gained 6 months of time toward his retirement while working for Delta, and acknowledged that he would have continued to accrue time toward his active-duty military retirement while working for Delta but that it would have taken longer.

¶ 79    Daniel also acknowledged that he only exercised the following parenting time in 2019: three overnights in February, one overnight in April, one overnight in June, and eight days over Christmas. Erica testified that his parenting time had not increased since he left his employment with Delta. As for health insurance, Daniel testified that, while he paid for the children's insurance premiums, he had not paid anything toward the children's medical co-pays or out-of-pocket health-related expenses. Daniel presented a demonstrative exhibit in which he represented that his 2017 gross income was $208,821.58, his 2018 gross income was $263,002.79, his 2019 gross income was $199,191.55, and his 2020 gross income was $192,696.22. However, with regard to his 2018 income, Daniel admitted in his testimony that the income listed in the exhibit did not include the employer-provided 401(k) matching that he received from Delta, which would have increased his total income to $300,000. Also, with regard to his 2017 income, the evidence showed that his total 2017 income was $246,014.50, his December 31, 2017, pay stub from Delta showed a total gross income of $174,611, he received an additional $28,609 in employer-provided 401(k) matching, his total entitlement from the reserves was $34,962, and he received an additional $7832.50 in consulting income.

¶ 80    After considering the above testimony and the credibility of the witnesses, the trial court found that Daniel's change of employment was voluntary and that he was unreasonably failing to take advantage of an employment opportunity at Delta. The court noted that it did not have to speculate as to Daniel's motivation for the change of employment because he admitted that he told Erica that he would choose flying jets over her and the children any day. The court also noted that Daniel followed through on this threat by voluntarily reducing his income after he agreed to pay Erica $9600 in temporary support and had signed the written agreement committing to pay $9400 per month to Erica, regardless of any change in active-duty status or voluntary change in employment. Based on the above, we find that the evidence supports the trial court's finding, and the court's denial of Daniel's motion to modify was not an abuse of discretion.

¶ 81                                    III. CONCLUSION
¶ 82    For the foregoing reasons, we affirm the judgment of the circuit court of St. Clair County.

¶ 83    Affirmed.