2022 IL App (2d) 210268-U
No. 2-21-0268
Order filed May 20, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF LISA CERVENKA | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 15-D-1287 |
| THOMAS CERVENKA, | ) ) ) | Honorable Christine A. Downs, |
| Respondent-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hutchinson and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in denying Thomas's petition to terminate maintenance. Therefore, we affirm.

¶ 2    Respondent, Thomas Cervenka, appeals from the trial court's denial of his petition to terminate maintenance to petitioner, Lisa Cervenka. Thomas argues that the trial court erred in ruling that the parties had entered into an enforceable postdecree agreement to continue maintenance payments despite Lisa cohabiting with another person. We affirm.

¶ 3                                I. BACKGROUND

¶ 4 The parties were married on September 1, 1996, and their marriage was dissolved on January 18, 2017. The parties had three children, who were ages 14, 11, and 8 at the time of the dissolution. The dissolution judgment incorporated by reference the parties' marital settlement agreement (MSA) dated November 7, 2016. The MSA was not attached to the dissolution judgment by agreement of the parties. Regarding maintenance, the MSA provided:

"5. The payments by the Husband to the Wife for her spousal support and maintenance shall continue until the first of the following events to occur:

a. The death of the Husband;

b. The death of [the] Wife;

c. The cohabitation of the Wife with another person on a resident, continuing conjugal basis; or

d. Twenty (20) years or two hundred forty (240) months from the date of this Agreement.

6. In the event the Wife remarries at any time during the term of marriage provided in Paragraph 5 (d) immediately hereinabove, the Husband agrees to pay and shall pay maintenance to the Wife as follows:

a. Effective the date the Wife remarries, the Husband shall continue to pay maintenance to the Wife at its then current value for twenty-four (24) months:

b. At the end of the twenty-four (24) month period, the Husband shall continue to pay maintenance to the Wife reduced by fifty percent (50%) of its then current value for months twenty-five (25) through and including month thirty-six (36) after the date the Wife remarries;

    c. At the end of the thirty-six (36) month period, the Husband shall continue to pay maintenance to the Wife again reduced by fifty percent (50%) of its then current value for months thirty-seven (37) through and including month forty-eight (48) after the date the Wife remarries; and

    d. The Husband's obligation to pay maintenance to the Wife in the event she remarries shall terminate after payment of the Husband of the forty-eight (48) months of maintenance provided in this Paragraph 6."

Relatedly, the dissolution judgment stated that Lisa was "forever barred from receiving maintenance from [Thomas] past, present and future except as is specifically set forth in the written" MSA.

¶ 5 Regarding the marital residence, the parties agreed in the MSA that Lisa and the children would live there, and that Lisa and Thomas would continue to hold title to the house as joint tenants. The parties further agreed that they would enter into a written lease agreement in which Lisa would pay Thomas $1,500 per month plus utilities, and Thomas would pay for all maintenance, repairs, and necessary capital improvements.

¶ 6 On December 19, 2019, Thomas filed a petition to terminate maintenance and for other relief, alleging that maintenance should be terminated because Lisa was cohabiting with Jason Seiden. Thomas alleged that they were both named as tenants in a lease agreement between Thomas and Jason.

¶ 7 Lisa filed a response to Thomas's petition on February 26, 2020, in which she admitted that Jason moved into the former marital residence with her on October 1, 2018, per written lease. As an affirmative matter, she alleged that in exchange for Jason paying $1500 per month to Thomas and taking over the upkeep of the house, Thomas agreed with Lisa that he would continue

to pay her maintenance. She alleged that Thomas prepared a written document dated September 28, 2018. The document states: "Payments of Maintenance to Lisa Cervenka will continue per the Marital Settlement Agreement dated November 7, 2016." The handwritten words "despite the cohabitation w/Jason Seiden" are inserted after the word "continue," and the added phrase is initialed. Lisa alleged that Jason had paid Thomas $1500 per month since October 8, 2018. Lisa alleged that had Thomas not agreed to her proposal, including continued maintenance payments, she would not have had Jason move in with her. She alleged that Thomas did not raise any issue about them living together until he decided to file petitions relating to the minor children in December 2019. Lisa alleged that since the fall of 2018, she had provided full-time care to the minor children having quit her job and limiting herself to part-time consulting work from home to address the children's needs, including one child being in out-patient treatment. She alleged that since that time she had relied on maintenance as her primary source of income. Lisa alleged that Thomas was therefore legally estopped from seeking to terminate maintenance.

¶ 8     It is undisputed that Thomas and Jason entered into a standard lease agreement on October 1, 2018, in which Jason agreed to pay Thomas $1500 per month as rent for living in the marital home with Lisa and the children. The lease states that the lease term was month-to-month beginning on October 1, 2018, and ending at any time with 90 days' notice to Thomas.

¶ 9     Subsequent to Thomas filing his petition to terminate maintenance, the parties were involved in extensive post-decree litigation that is not at issue in this appeal, such that action on Thomas's petition did not resume until 2021. On April 5, 2021, Thomas filed a brief in support of his petition to terminate maintenance. He argued that the document signed on September 28, 2018, was not a valid and enforceable contract to modify the dissolution judgment because there was no court order modifying the MSA, there was no consideration given to him for signing the September

28, 2018, document, and the MSA precluded the parties from modifying the terms of their maintenance awards and/or waivers.

¶ 10    Also on April 5, 2021, Lisa filed a brief in support of her position. She stated that Thomas admitted in his response to admit facts that he prepared the September 28, 2018, document; that Lisa added the words "despite cohabitation w/Jason Seiden"; and that Thomas initialed next to the words and signed the document. Lisa stated that Thomas and Jason also entered into the lease agreement, and that between October 1, 2018, and April 6, 2021, Jason paid Thomas 31 payments of $1500 and was current in his rent obligation. She argued that the September 28, 2018, document was a proper modification of the MSA; that the document was also a contract; that Thomas created a landlord-tenant relationship with Jason superseding any resident, continuing conjugal basis relationship; and that Thomas was estopped from claiming that maintenance should be terminated.

¶ 11    A hearing on the petition took place on May 6, 2021, after which the trial court issued an order finding as follows. The document dated September 28, 2018, was initialed and signed by Thomas and was a valid agreement and a valid modification of the parties' MSA. There was consideration supporting the September 2018 agreement in that it was tied to the rent paid pursuant to the lease between Thomas and Jason and the parties' agreement for Lisa and the children to remain in the home. Thomas was estopped from claiming that he had the right to terminate maintenance based on Lisa's cohabitation with Jason under the circumstances of the case. The trial court therefore denied Thomas's petition.

¶ 12    Thomas timely appealed.

¶ 13                                   II. ANALYSIS

¶ 14    Thomas argues that the trial court erred in finding that the September 28, 2018, document was a proper modification of the parties' MSA. He notes that in the MSA, the parties contracted

for termination of maintenance events as well as extension of maintenance events. See *supra* ¶ 4. Thomas points out that the MSA was incorporated into the dissolution judgment and that the dissolution judgment stated that Lisa was barred from receiving maintenance except as specified in the MSA. Thomas notes that one of the termination of maintenance events in the MSA was Lisa's cohabitation with another person on a resident, continuing conjugal basis. Thomas highlights that section 502(b) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/502(b) (West 2016)) states:

> "The terms of the agreement *** are binding upon the court unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties, on their own motion or on request of the court, that the agreement is unconscionable."

Thomas argues that there was no subsequent order by the trial court modifying the parties' MSA, and that although the amount of maintenance may be modified, the terms of the MSA are not subject to modification, specifically the maintenance termination events. Thomas argues that because it is not disputed that Lisa has been cohabiting with Jason since at least October 1, 2018, Thomas's maintenance obligation to Lisa should end pursuant to the parties' MSA.

¶ 15    Thomas additionally argues that the parties' MSA precludes them from modifying the terms or their maintenance awards and their waivers. See *In re Marriage of Brent*, 263 Ill. App. 3d 916, 924 (1994) ("An agreement which clearly and expressly limits a court's ability to modify maintenance will preclude modification of maintenance upon grounds not specified in the agreement.").

¶ 16    Thomas contends that even if this court determines that the MSA could be modified outside of the agreement, the September 28, 2018, document was not a valid contract because it lacks

consideration, in that nothing was exchanged between the parties for Thomas's promise. Thomas acknowledges that he was receiving $1500 per month from Jason in rent, but he argues that the exchange of rent is the consideration for the lease agreement and cannot serve as consideration for the September 28, 2018, document. He cites *White v. Village of Homewood*, 256 Ill. App. 3d 354, 357 (1993), where the appellate court stated that the "pre-existing duty rule provides that where a party does what it is already legally obligated to do, there is no consideration as there is no detriment." According to Thomas:

> "Lisa admits *** that Thomas and Jason created a landlord-tenant relationship and that Jason is obligated to pay Thomas $1,500.00 per month in exchange for Jason being permitted by Thomas to move into and live in the former marital residence as a tenant. [Record citation.] Thus, Jason is already under a pre-existing legal duty to pay Thomas $1,500.00 per month for rent. Despite the Standard Lease Agreement being signed on October 1, 2018 and the document in question being signed beforehand on September 28, 2018, the pre-existing legal duty rule applies."

¶ 17 Lisa argues that the trial court correctly found that the parties agreed to modify the maintenance provisions originally set forth in the MSA. She maintains that the September 28, 2018, agreement was a knowing modification by Thomas of his original right to terminate maintenance under the MSA if Lisa cohabited with another individual on a resident, continuing conjugal basis. She argues that the language of the September 28, 2018, agreement is clear, and the significance of the agreement is further supported by the parties' conduct surrounding the agreement, in that contemporaneous with its execution, and as a result of the agreement, Jason entered into a lease agreement with Thomas as landlord on October 1, 2018.

¶ 18     Lisa argues that the trial court also properly found that the September 28, 2018, agreement was supported by consideration. She argues that she had a possessory interest in the marital residence pursuant to the MSA and a lease between her and Thomas, such that she could have excluded other occupants and had to approve Jason's possessory interest as set forth in the October 1, 2018, lease. Lisa notes that Jason is paying Thomas an additional $1500 per month in rent, beyond the monthly $1500 payments that Lisa was paying to Thomas. Lisa argues that the September 28, 2018, agreement was therefore an inducement by Thomas to Lisa and Jason to enter into the subsequent lease agreement. Lisa contends that as a result of the inducement, Thomas received a lease agreement with an additional paying tenant in exchange for giving up his right to terminate maintenance despite Lisa's cohabitation with Jason. Lisa points out that the parties performed as agreed for over 14 months before Thomas filed his petition to terminate maintenance.

¶ 19     Lisa additionally argues that enforcing the parties' agreement is not against public policy, but rather it "would be contrary to the interests of judicial economy and simple justice to allow [a party] to escape the obligation to which he agreed ***." *In re Marriage of Adamson & Cosner*, 308 Ill. App. 3d 759, 768 (1999). Lisa argues that section 502 of the Marriage Act (750 ILCS 5/502 (West 2016)) reinforces the idea that courts will honor parties' agreements as to maintenance and other issues as long as the agreements were not unconscionable. Lisa asserts that the trial court did not impose new termination provisions on the MSA or unilaterally change its terms, but rather simply upheld and enforced the parties' agreement. Lisa argues that, stated differently, the parties themselves chose to deviate from the MSA, and the trial court merely approved the parties' agreement. For the same reasons, Lisa argues that enforcement of the parties' September 28, 2018, agreement was not precluded by the MSA.

¶ 20 Finally, Lisa argues that the doctrine of promissory estoppel prevents Thomas from terminating maintenance. She maintains that in the trial court, she argued this doctrine in the alternative, in the event that the trial court determined that consideration was lacking for the September 28, 2018, agreement. Lisa argues that she relied on Thomas's promise in the September 28, 2018, document as evidenced by the execution of the October 1, 2018, lease that expressly identifies herself and Jason as tenants, and the subsequent performance of the lease wherein they and the parties' children resided in the residence. Lisa contends that but for Thomas's promise, she would not have permitted Jason to secure a possessory interest in the residence as an additional tenant or permitted him to cohabit with her in the residence, let alone be identified as a party to a lease with Jason, especially with Thomas as landlord. She notes that the lease and her cohabitation with Jason would have terminated maintenance, but for Thomas's promise.

¶ 21 According to Lisa, the trial court found that consideration was present and that it did not need to address the merits of the promissory estoppel argument. See *Prentice v. UDC Advisory Services, Inc.*, 271 Ill. App. 3d 505, 513 (1995) (promissory estoppel "is not available *** where there is in fact a contract between the parties"). Noting that we may affirm the trial court's decision on any basis supported by the record, Lisa argues that even if we find that consideration was lacking, we should still affirm the trial court's decision to deny Thomas's petition to terminate maintenance, on the grounds of promissory estoppel.

¶ 22 In his reply brief, Thomas argues, among other things, that the issue of promissory estoppel was never addressed at the May 6, 2021, hearing and was not a consideration in the trial court's ruling. Thomas argues that, therefore, the issue of whether promissory estoppel applies is not properly before this court. Thomas further argues that Lisa has forfeited this argument based

on these circumstances, and that to address its merits would seriously prejudice him because he was not able to present evidence in the trial court to refute her claim of promissory estoppel.

¶ 23    We first address the question of whether the MSA's terms were modifiable. We construe a marital settlement agreement in the same manner as any other contract. *In re Marriage of Dynako*, 2021 IL 126835, ¶ 15. We must ascertain the parties' intent, which is best determined by the language the parties used in their agreement. *In re Marriage of Wig*, 2020 IL App (2d) 190929, ¶ 23. Where the language is unambiguous, it must be given its plain and ordinary meaning. *Id.* The interpretation of a marital settlement agreement is a question of law we review *de novo*. *In re Marriage of Dynako*, 2020 IL App (1st) 192116, ¶ 22.

¶ 24    The MSA stated that maintenance would terminate after 20 years or earlier if certain termination events occurred, including the cohabitation with another person on a resident, continuing conjugal basis. Section 502(f) of the Marriage Act states that the dissolution judgment "may expressly preclude or limit modification of other terms set forth in the judgment if the agreement so provides" (750 ILCS 5/502(f)) (West 2016)). This provision allows the parties "to maximize the benefits of future planning and eliminate the uncertainties arising from the fear of future motions to increase or decrease the parties' obligations." *In re Marriage of Adamson & Cosner*, 308 Ill. App. 3d at 765-66. Here, the dissolution judgment stated that Lisa was "forever barred from receiving maintenance from [Thomas] past, present and future except as is specifically set forth in the written" MSA.

¶ 25    We agree with Thomas that the language of the MSA and dissolution judgment shows that at the time the parties agreed to the MSA, they intended that the maintenance provisions be non-modifiable. Section 502(a) states that to "promote amicable settlement of disputes between parties to a marriage attendant upon the dissolution of their marriage" (750 ILCS 5/502(a) (West 2016)),

the parties may enter into an agreement that addresses maintenance, among other issues. Section 502(b), which Thomas cites, states that other than provisions relating to the support and parental responsibility of children, the agreement's terms are binding upon the court unless the terms are unconscionable. 750 ILCS 5/502(a) (West 2016). Under section 502(b) and (f) of the Marriage Act and *In re Marriage of Brent*, 263 Ill. App. 3d at 924, the case which Thomas cites, the MSA's terms were binding on the court.

¶ 26    However, that the MSA's terms were binding on the trial court does not mean that they precluded the parties from agreeing to modify the MSA. As we stated in *In re Marriage of Adamson & Cosner*, 308 Ill. App. 3d at 766:

> "Either party could have forced the other to abide by the terms of the original judgment and thereby preserved the value inherent in the certainty provided by section 502(f). Nevertheless, the parties agreed to modify the agreement. If the parties may agree between themselves that certainty is beneficial, there is no reason why they should not later be allowed to agree that modification provides benefits that outweigh those provided by certainty. Consequently, we hold that although the trial court was precluded from modifying the agreement, the parties themselves retained the power to modify their agreement in response to changed circumstances."

See also *In re Marriage of Boehmer*, 371 Ill. App. 3d 1154, 1157-58 (2007) ("This court has extended the provisions of section 502 to postdecree agreements, holding that when the parties agree to settle a postdecree property dispute by modifying the underlying judgment or marital settlement agreement, section 502 requires the trial court to enforce the new agreement unless it is unconscionable."). Accordingly, the parties could agree to modify the MSA's terms.

¶ 27 Thomas argues that *In re Marriage of Adamson & Cosner* is distinguishable because the parties there had entered into an amended judgment of dissolution modifying the terms of their original judgment of dissolution. Thomas maintains that the amended judgment in that case was entered by the trial court by agreement of the parties and was the basis for the appellate court's ruling that the amended judgment was binding on the parties. Thomas argues that here, in contrast, the September 28, 2018, document was never memorialized and entered as a binding order by the trial court. We believe that this is a distinction without a difference, as here the trial court found that the parties' agreed to modify the MSA and enforced their agreement in one step, as opposed to the two steps in the cited case.

¶ 28 We next turn to the issue of consideration. The elements of a contract are offer, acceptance, and consideration. *In re Marriage of Stoker*, 2021 IL App (5th) 200301, ¶ 61. Consideration is the bargained-for exchange of promises or performances. *Id.* Any act or promise that benefits one party or is a detriment to the other is sufficient consideration (*id.*), and we will not inquire into the adequacy of consideration to support a contract (*Chandra v. Chandra*, 2016 IL App (1st) 143858, ¶ 16). We review *de novo* the legal question of whether a contract contains consideration. *In re Marriage of Stoker*, 2021 IL App (5th) 200301, ¶ 61.

¶ 29 We agree with Lisa that there was consideration to Thomas for the September 28, 2018, agreement in that Lisa allowed Jason to move into the marital residence with her and the children, and Thomas received an additional $1500 from Jason per month as a result. Thomas's argument, that the agreement lacks consideration under the pre-existing duty rule, is meritless, as on September 28, 2018, Jason had not yet signed the lease agreement.

¶ 30 Even if, *arguendo*, the contract lacked consideration, Thomas would be barred from terminating maintenance under Lisa's claim of promissory estoppel. We note that although both

parties indicate that the trial court did not reach this issue, the trial court explicitly stated in its written order that Thomas was "estopped from claiming he has a right to terminate maintenance based upon cohabitation with Mr. Seiden under the circumstances presented to the Court." Regardless, we may affirm the trial court's judgment on any basis appearing in the record (*In re Marriage of Wig*, 2020 IL App (2d) 190929, ¶ 15), and Lisa clearly asserted promissory estoppel as an alternative argument. Though Thomas argues that he was precluded from providing evidence on this issue at the hearing, he has not provided a report of proceedings from the hearing. As the appellant, Thomas has the burden to provide a sufficiently complete record of the trial proceedings to support his claims of error, and we must resolve any doubts arising from the lack of a complete record against the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 31 "Promissory estoppel is a common-law doctrine adopted to permit the enforcement of promises that are unsupported by consideration, such as gratuitous promises, charitable subscriptions, and certain intrafamily promises." *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 91. It can apply only if there is no express agreement, as it is intended as a method to enforce gratuitous promises. *Id.* ¶ 92. The elements of a claim of promissory estoppel are that (1) the defendant made an unambiguous promise to the plaintiff, (2) the plaintiff relied on the promise, (3) the plaintiff's reliance was expected and foreseeable by the defendant, and (4) the plaintiff relied on the promise to the plaintiff's detriment. *Id.* ¶ 95.

¶ 32 It is clear from the timing and content of the September 28, 2018, document and the October 1, 2018, lease that Lisa was aware that allowing Jason to live in the marital home would terminate her maintenance under the cohabitation provision, and that she wanted a written assurance that Thomas would agree that it would not affect maintenance. By signing the September 28, 2018, document, Thomas made an unambiguous promise to Lisa. It was only subsequent to

Thomas signing the September 28, 2018, agreement that Jason signed the lease and was permitted to move in with Lisa, showing that Lisa relied on the promise, which was expected and foreseeable to Thomas given the financial significance of the maintenance that would otherwise be terminated. The last element of promissory estoppel, that Lisa relied on the promise to her detriment, would also be satisfied if the September 28, 2018, agreement is found to be unenforceable based on lack of consideration.

¶ 33    Again, we have concluded that the September 28, 2018, agreement was a valid contract that contained consideration and amended the parties' MSA. Therefore, the trial court did not err in denying Thomas's petition to terminate maintenance. Even if the September 28, 2018, agreement could not be considered a contract, the doctrine of promissory estoppel would apply, with the same result.

¶ 34                                   III. CONCLUSION

¶ 35    For the reasons stated, we affirm the judgment of the Kane County circuit court.

¶ 36    Affirmed.