NOTICE
Decision filed 01/20/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220114-U

NO. 5-22-0114

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| SHRUTI DAVE, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 20-D-94 |
| | ) | |
| MANISH DAVE, | ) | Honorable |
| | ) | Sam A. Limentato, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court's order granting the motion to enforce settlement agreement is affirmed where the oral settlement was neither vague nor unfair, and respondent's claims of duress and objections to the agreement lacked credibility. The trial court's judgment of dissolution is affirmed where language addressing the parties' debts, assets, and valuation date was not against the manifest weight of the evidence; however, the trial court's inclusion of language addressing the distribution of the parties' personal property is vacated as being arbitrary.

¶ 2     Respondent, Manish Dave, appeals the trial court's August 25, 2021, order granting petitioner, Shruti Dave's motion to enforce settlement agreement and the trial court's September 15, 2021, judgment of dissolution of marriage. For the following reasons, we affirm in part and vacate in part.

1

¶ 3                                    I. BACKGROUND

¶ 4     Shruti and Manish were married on May 23, 1995, in Ahmedabad, India. On February 26, 2020, Shruti filed her petition for dissolution of marriage alleging irreconcilable differences. Manish filed his answer on April 9, 2020, admitting all the allegations in Shruti's petition and raising an affirmative matter requesting temporary maintenance, permanent maintenance, and payment of his attorney fees.

¶ 5     Shruti's financial affidavit, filed on May 7, 2020, listed her annual gross income and the parties' assets which included the marital residence, numerous financial assets, and two vehicles totaling approximately $2.4 million. The marital home and both vehicles were paid off. No debt was listed.

¶ 6     On August 25, 2020, Shruti filed a petition requesting exclusive possession of the marital home and a job search order. The petition alleged that she was employed as an endocrinologist and Manish, although experienced as a communication engineer, remained unemployed and was not seeking employment. She further alleged that Manish lived away from the marital home for almost a decade with minimal contact but moved back into the marital residence during the COVID outbreak, without invitation, and was living in the basement while she and their daughter resided in the upper level of the home. The petition alleged that Manish's continued presence in the home was jeopardizing Shruti and their daughter's mental health.

¶ 7     Manish's attorney moved to withdraw on August 26, 2020, and he obtained new counsel on September 8, 2020. Shruti's motion for exclusive possession proceeded to hearing on November 5, 2020. Following the hearing, the trial court denied the petition in a docket entry and directed the parties to contact the clerk to schedule a two-day trial on financials. No transcript from the November 5, 2020, hearing is contained in the record on appeal.

¶ 8    On November 12, 2020, Manish filed his financial affidavit stating he was unemployed and had no income. He listed assets that included the marital residence, financial assets, and vehicles amounting to approximately $2 million. The affidavit confirmed the marital home and vehicles were paid off. No debt was listed. The affidavit asserted that money in the investment account, specifically, the Charles Schwab account, along with $101,000 in the Chase bank account was nonmarital property belonging to him. The affidavit further stated that he expected he would require between $7000 and $11,000 monthly after the divorce to keep in line with his current standard of living.

¶ 9    On December 7, 2020, the court allotted two days for trial setting the matter for April 26, 2021, and April 28, 2021. On March 17, 2021, Manish's second counsel withdrew, and Anne Martinkus entered her appearance on behalf of Manish.

¶ 10    On March 19, 2021, Shruti filed an updated financial affidavit. The updated information included Shruti's annual gross income and the parties' assets to incorporate those previously disclosed by Manish. The assets included the marital home, five bank accounts, one certificate of deposit, two investment accounts, and eight retirement accounts equating to approximately $3.45 million. No debt was listed.

¶ 11    On April 12, 2021, Manish filed an updated financial affidavit. He remained unemployed. The affidavit listed three additional bank accounts at Axis Bank in India with an approximate value of 2.97 million rupees, and two stock accounts in India with no values provided. The other assets remained as previously listed but contained updated values.

¶ 12    On April 20, 2021, Shruti filed an updated financial affidavit related to her annual gross income. The listed assets remained the same but contained updated values.

¶ 13    Following a pretrial conference on April 26, 2021, with the judge, the hearing was continued until April 28, 2021. Thereafter, both parties, with the assistance of their counsel, proceeded to engage in settlement negotiations.

¶ 14    On April 28, 2021, the parties presented before the trial court. Ms. Martinkus advised the court that the parties reached a settlement agreement "on all issues" and recited the terms to the court. The recitation included the following terms relevant to this appeal:

> "The parties' marital home *** in Champaign, Illinois shall be sold. *** Respondent shall receive 60 percent of the net proceeds from the sale of said residence. The *** Petitioner shall receive 40 percent of the net proceeds of said real estate. *** Respondent shall receive 60 percent of the retirement assets, cash, and investments. The Petitioner shall receive 40 percent of the retirement assets, cash assets, and investments. The Respondent shall provide three years of his Fidelity statements for his retirement assets. Each party shall pay their individual attorney's fees. The Respondent shall receive the sum of $113,758.00 from his Chase account prior to the 60/40 split ***, as it is his nonmarital property. The Petitioner shall receive the Acura TL 2010. The Respondent shall receive the 2010 MDX Acura. *** The Petitioner shall sign all documents necessary for the Respondent to liquidate the account—the Axis account in India, including the documents necessary to also liquidate the brokerage account linked to the Axis account. The parties shall divide equally all gold located in the United States and India."

¶ 15    Ms. Martinkus stated she would prepare the written order and advised the court that an additional term for the agreement was that it would be "enforceable even though it has not been memorialized in writing." Shruti's counsel agreed with Ms. Martinkus's recitation of the oral argument and requested "this be the Court's order." The court confirmed the agreement would be

4

binding immediately although it was not memorialized in writing. Upon query by the court, Shruti affirmatively stated this was the agreement and that she entered into it freely and willingly. She further confirmed this was the order that she wished to have entered and eventually enforced, if necessary. Manish also affirmatively stated that the agreement was what he understood it to be, and that it resolved all the matters, including "the waiver of maintenance." When asked if he was entering the agreement freely and willingly, Manish said, "Yes." When asked if this was the order he wanted the court to enter and enforce, if necessary, Manish responded, "Correct, yes."

¶ 16     On May 25, 2021, Ms. Martinkus moved to withdraw as Manish's counsel. On June 16, 2021, Shruti filed a motion to enforce the settlement agreement and for entry of judgment of dissolution of marriage. Attached to the motion was a transcript from the April 28, 2021, hearing as well as a proposed marital settlement agreement (MSA). Attached to the MSA was "Exhibit A" which listed the marital residence along with the parties' financial assets and provided the name, type, and value for each financial account. The listed assets were in excess of $4 million.

¶ 17     The motion to withdraw and the motion to enforce settlement agreement were set for July 6, 2021. Following arguments, the trial court entered an order allowing Ms. Martinkus to withdraw, granted Manish time to obtain new counsel, continued the hearing for Shruti's motion to enforce, and rescheduled that hearing for August 5, 2021.

¶ 18     Manish's new counsel entered his appearance on July 23, 2021, and filed an objection to the motion to enforce settlement agreement on August 4, 2021. The objection claimed the oral settlement was unenforceable because it was the product of duress, stemming from last minute settlement negotiations, and Manish's counsel made statements indicating the court had a negative impression of Manish due to his appearance at a prior hearing and would likely rule against Manish if the case proceeded to hearing.

5

¶ 19    The objection also contended the settlement was unenforceable because Manish learned his father was "gravely ill" and "likely to die in the near future" during the settlement negotiations, and that Manish had a hearing disability, and did not correctly hear the recited settlement agreement. The pleading further contended the oral agreement was unconscionable based on Manish's contention that his waiver of maintenance cost him over $1 million and failed to adequately address the parties' assets, the parties' debt, or allocate tax liability.

¶ 20    Hearings on the motion to enforce settlement were held on August 5, 2021, and August 25, 2021. On August 5, 2021, Shruti's attorney called Ms. Martinkus, who testified that she met with Manish multiple times during the four months she represented him, and they discussed, at length, the parties' nonmarital and marital assets.

¶ 21    With regard to Manish's allegations of diminished hearing, Ms. Martinkus testified that about a week before the oral settlement, Manish advised her that his job opportunities were limited due to his diminished hearing. She asked if he had any medical or physician evidence regarding the condition and he stated he did not. Ms. Martinkus testified that at no time during the settlement negotiations did Manish indicate to her that he could not hear any of the conversation. She confirmed that she recited the parties' oral agreement to the court and that Manish never told her, either when they were in the courtroom or when they were outside the courtroom, that he had any trouble hearing what was stated in the courtroom. Ms. Martinkus met with Manish one time after the hearing and Manish did not state that he could not hear what transpired in the courtroom at that meeting.

¶ 22    Ms. Martinkus confirmed that she had an asset list that she reviewed with Manish prior to the settlement negotiations. She stated that opposing counsel also had an asset list and she went over that list with Manish as well. She stated that at no time did Manish ever indicate there were

6

missing assets from the lists. Ms. Martinkus confirmed that she knew Manish's father had COVID. She stated Manish never expressed a desire to stop negotiations or indicated he was too traumatized, due to his father's illness, to continue negotiations or proceed that day. At no time, either during the negotiation process or thereafter, did Manish state that he felt coerced into the settlement, that he was under duress during the negotiations, that the agreement was unconscionable, or refer to the negotiations as "last minute." She stated that she and Manish spent several hours the day before negotiations and then came back and spent several hours more working through negotiations.

¶ 23    When asked if she told Manish that the court had a negative impression, Ms. Martinkus stated that she told Manish the judge had some credibility issues with him based on his job search. She denied telling Manish the judge did not like him or was going to rule against him.

¶ 24    Ms. Martinkus testified that Manish never indicated that he wanted to see a written agreement on all the financial issues before settling the case. She further stated that she told Manish the oral agreement would be a binding final agreement. She stated there were numerous negotiations and a great amount of time was spent with him going through things. She never observed, either prior to or after the recitation of the agreement to the court, anything that indicated Manish lacked the free will or quality of mind necessary to enter into a valid contact.

¶ 25    Ms. Martinkus identified Exhibit A as the list she used during the negotiations that contained all of the marital assets and stated both parties agreed those were the assets. The list contained no debt because the parties had no debt. She stated Manish reviewed the exhibit, calculated the value of the assets, obtained updated information for the accounts, including the Indian accounts, and acknowledged to her that he was in agreement with the exhibit. She stated that Manish did not want the Indian accounts to be part of the MSA, but she told him they were

jointly owned assets and they had to be part of the agreement, even though he was the only one who could access that account. The parties agreed this was all the money in India and how it was going to be divided. She stated that it was agreed that Manish would initiate the withdrawal because Shruti did not have the ability to access those funds under Indian law.

¶ 26    Ms. Martinkus testified that she believed the settlement was fair and equitable and why she did not believe this was a permanent maintenance case. Although Manish was unemployed for two years, she believed he was capable of working. With the 60/40 split, and the amount Manish was receiving, no job search would be necessary, and he would not have to return to court. She stated that Manish twice left the negotiations to speak to his adviser. She disputed coercing Manish into settlement. She told him she believed it was a fair settlement and that an award of maintenance was not automatic. She never threatened him or said anything that would make him think she would not take the case to trial.

¶ 27    On cross-examination, Ms. Martinkus agreed that she first time she discussed this "not being a maintenance case" with Manish was following the court's settlement conference on April 26, 2021. After the conference, she advised Manish that the court recommended a 60/40 split in lieu of maintenance because the court believed Manish was qualified to work. With regard to Exhibit A, she again confirmed that it was the document she and Shruti's counsel were relying upon and both lawyers, as well as their clients, knew it was the exhibit that would be included with the MSA.

¶ 28    When questioned about assets not contained on the exhibit, Ms. Martinkus was unaware of any other asset beyond those determined through discovery. She stated that if Manish was claiming additional assets, he never disclosed them to her and all assets he presented to her were included in the exhibit.

¶ 29     As to the Charles Schwab account, Ms. Martinkus disputed ever saying it was a nonmarital account. She said the account was "established 20-some years ago and it was jointly held and had been jointly held for the last 20 years." She knew the details about how the money was received and stated Manish never provided her with any documents related to the account.

¶ 30     Ms. Martinkus disputed Manish telling her that he was leaving the negotiations to speak about his father; she stated he told her he was leaving to speak with an adviser. She again disputed Manish having hearing difficulties at the hearing. She stated she and Manish went over what would be recited to the court and "he knew based on what he and I had discussed that this was the exhibit, that this was going to be divided 60/40. That was exactly what our agreement was[,] and he knew exactly *** what was going to be recited in open court. *** and *** was recited in open court."

¶ 31     With regard to the prior hearing where Manish's credibility was questioned, Ms. Martinkus clarified that she was not Manish's attorney at that time but Manish's position at that hearing lacked credibility and she told him there were credibility issues. She disputed ever telling Manish he had to settle the case. She stated she had been practicing for 25 years and never forced, threatened, or coerced anybody to settle a case. Thereafter, Shruti rested.

¶ 32     Respondent's counsel called Manish to testify. He stated he was previously employed as a systems engineer and Shruti was a physician. He stated they had been married for close to 24 years and Ms. Martinkus told him he would receive $59,886 per year in maintenance. They arrived at the courthouse on April 26, 2021, and he was placed in a conference room for about 45 minutes. When Ms. Martinkus entered, she was looking down, would not make eye contact, and told him the judge did not like him. He asked her if it was about the exclusive possession of the home, and she said yes. Manish said he was surprised because he did not speak during that hearing. He stated Ms. Martinkus also informed him of the trial court's recommended 60/40 split, which was

9

surprising and eroded his confidence. He did not know what to do. He testified that he told his attorney that he did not agree to this and thought they were going to do spousal maintenance. She responded by saying, "this is what is. We will go from here." He told her that he did not want to move forward; they talked a bit, did not come to any agreement, and he left for the day.

¶ 33    Manish then met with Ms. Martinkus the next day and discussed spousal maintenance. It was his impression they would be moving forward with maintenance and did not consider the 60/40 division. He stated he wanted spousal maintenance and a 50/50 split. Ms. Martinkus told him she believed he was going to get it and getting spousal maintenance was the right course to go. He stated she never advised him that she had any doubts about him receiving maintenance.

¶ 34    Manish testified that when he arrived at the courthouse on April 28, 2021, he was still intending to seek maintenance; however, his lawyer provided him with a case where the parties agreed on a split rather than spousal maintenance. He told her he was not going to read it because she was the lawyer. She told him it was a good case, to look at it, read it, and consider it. He stated thereafter, they went into separate rooms to negotiate. The only time they were all in the same room was when they were reading what she had written on a piece of paper as a 60/40 split. That paper was not Exhibit A, and he never saw Exhibit A until it was attached to the proposed MSA.

¶ 35    Manish stated that he left during negotiations because he needed to breathe. He walked around the parking lot to clear his head because everything had changed. He also looked at his phone and had a long message from his sister stating that his father was close to dying. After listening to the message, he did not know what to do. He choked up, sat there for a while, walked into the courtroom, and just wanted to cry. He disputed ever telling Ms. Martinkus that he wanted to call some advisors to talk about the settlement agreement.

¶ 36    When he came back into the negotiations, the frustration began again because Ms. Martinkus said, "it's a good thing, take it. It is right thing to do. It is the most logical thing to do because you are in such a spot." At that point, he did not know what to do and it was impossible for him to think so he decided to go along with it.

¶ 37    Thereafter, they went to the courtroom to recite the agreement. He stated that he was aware that he was in the courtroom, but his heart and his thoughts were not there. Prior to the recitation, he stated that he told Ms. Martinkus he was not willing to agree to everything she was writing and wanted the agreement in writing. She explained the agreement would be recited to the court and written later. He stated he was sad and depressed when he was in court.

¶ 38    Manish admitted knowing what the agreement was and that it would be recited to the court. He stated he was not "in the mood" to make choices at that time. He stated that he "didn't think anything mattered at that point and he just did not want to be there." He stated that the assets that were to be split 60/40 were on the piece of paper Ms. Martinkus received from opposing counsel. He did not believe the Charles Schwab account, which contained gifted funds from his family in 1990, was marital and stated the money from his family "was for me."

¶ 39    Manish stated that he suffered from 50% hearing loss in his right ear and 20% loss in his left ear. He was sitting on the left side of his attorney in court and did not hear what she was saying. He thought she was doing some kind of due diligence required in the court room. He stated that he still needed to know what exactly was being divided and anticipated reviewing the written document. He did not know what was being divided 60/40 following the hearing because it was never clarified and there was a different document that resembled Exhibit A.

¶ 40    Manish also stated that Ms. Martinkus did not say the oral argument was going to be binding and he "had no idea" what the word "binding" meant. When he did see Exhibit A, he was

surprised to see the Charles Schwab account on the list. He explained the funds came from the sale of a liquor store, and stated,

> "Those proceeds were then channeled into an investment in Charles Schwab, and we put— I put the money in there and—and that money just sat there in the stocks which was purchased. Initially there was some shuffling. We—I bought some mutual fund and then we invested in some stocks, and that's how it was."

He stated that he tried to explain to Ms. Martinkus that the account was nonmarital and she repeatedly told him it was a joint account. He stated that he never agreed that the marital asset should be a 60/40 split. Thereafter, court recessed.

¶ 41    The hearing continued on August 25, 2021. Manish stated that his father died the day after the April 28, 2021, hearing. He agreed that the settlement agreement recited to the court made no reference as to how debts were going to be divided. He stated that he and his wife had joint debts, stemming from assets in India which required them to pay taxes in both the United States and India, that needed to be divided.

¶ 42    Manish again addressed how the Charles Schwab account was funded by the sale of a liquor store and referenced exhibits to support his testimony. He testified that he received about $50,000 following the liquor store sale and referenced July 7, 1998, correspondence (Exhibit 2), related to the liquor store sale.[1] He further stated that his Crestor bank statement (Exhibit 1) reflected his proceeds from the sale by the December 29, 1997, deposit in the amount of $50,551.90. He referenced two checks written on that account, each in the amount of $20,000 and stated those checks were deposited in the Charles Schwab account.[2] He stated the total (and current) amount

---

[1]Exhibit 2 indicates that Manish received $25,000 following the liquor store sale.
[2]No copy of the checks was included in the bank statement.

in the Charles Schwab account was an accumulation of interest and earnings on that initial deposit from the sale of the liquor store and stated he was claiming that as his nonmarital property.[3]

¶ 43    Manish also testified that other assets were not accounted for in the proposed MSA. He stated there were assets in India, held by an investment account named Motilal Oswal, "which had periodic dividends which he was liable for taxes." He also stated there were other bank accounts in his wife's and her father's names that were not listed on the MSA, or Exhibit A. Manish reviewed Exhibit 3, which was an Axis Bank statement. He identified other assets that were owned, either by him or his wife, in India. He further testified that the deposits listed on the statement, as well as emails sent directly to him (Exhibit 4), were dividends, but he did not know the source although "[m]ost likely, it is stock." He did not know who owned the stock that was providing the dividends. Manish stated that the settlement agreement failed to mention how the stock that was paying the dividends was going to be divided.

¶ 44    Manish next identified Exhibit 5, which he stated was the Indian equivalent of a W-2, for the tax due on the dividends. Following an objection based on the documents not being provided in discovery, which was overruled, the court reminded the parties of the issue at the hearing and urged them to "move along."

¶ 45    Manish identified Exhibit 6 as a statement from Motilal Oswal and claimed the document stated there were additional assets with that company. Counsel again objected due to failing to provide the document in discovery. The court looked at the document and asked why they were addressing $934 in a $3 million estate to which Manish's counsel stated, "I think that's just one piece of the puzzle." After questioning Manish about the document, to which Manish speculated

---

[3]No Charles Schwab account statement addressing any part of the period from December 1997 to the present was submitted into evidence.

as to the value, he stated he did not know who owned the asset, but it was "just trickling *** as a dividend into my account that's all."

¶ 46 Manish identified Exhibit 7 as stock certificates in Shruti's and her father's names. Counsel again objected due to the failure to produce the document in discovery. When asked if the document was an example of Shruti's assets that were not accounted for in the MSA, Manish replied, "Possibly, yes."

¶ 47 On cross-examination, Manish agreed Shruti brought the account passbook to the settlement negotiation but did not recall her stating that she tried to close it but could not, due to Indian protocol. He further stated that he was not sure if the money in that account was moved to the Axis account. He stated the brokerage account was not the same as Axis Bank although he agreed that in the MSA it indicated that any investments, and the brokerage accounts, were investment accounts. Manish agreed the Charles Schwab account was a joint account but disputed telling Shruti it was also her money.

¶ 48 On redirect, Manish agreed that the documents he presented traced by clear and convincing evidence that the source of the money was a nonmarital gift from his father. He stated that he put both names on the Charles Schwab account because he did not know "any better" and never intended to make a gift to Shruti with any portion of that money. On recross, Manish admitted that he never took Shruti's name off the Charles Schwab account after it was opened. Exhibits 1-7 were admitted with no objection, and Manish's counsel rested.

¶ 49 Thereafter, Shruti's counsel called Manish as an adverse witness. He stated that the reason they were now in court was because he felt "that whatever agreed to, I didn't want to do that. That is not what I intended to do." When asked if when he left the courthouse that day if it was his understanding that there was an agreement, Manish replied, "We had an agreement—well I

14

decided in—in court basically that's what I'm trying to say, that I asked Ms. Martinkus, can I have it in writing? And she says yes, you will have it in writing." When asked whether he recalled answering very candid questions from court about whether or not he understood the agreement and whether or not he agreed with the agreement, Manish replied, "I was, as I said, in a very stressful state of mind, so I was—I wanted to—actually I didn't want to do anything."

¶ 50    During closing arguments, Shruti's counsel noted that there was testimony at the exclusive possession hearing, as well as Manish's financial affidavit, that there was no debt. He lived in the house for over two years and paid no water bill, no electric bill, no mortgage, no taxes, and no insurance. He received $2.4 million as his portion of the 60/40 division, plus an additional $113,758 in nonmarital funds. He had $2.5 million and no debt. To claim the agreement was unconscionable or unfair was "unthinkable." There was no duress or coercion. Manish came into the courtroom and willingly agreed to abide by the terms recited to the court. Counsel further stated that during the two days of negotiations at the courthouse, Manish could have fired his attorney, told the court he disagreed with everything, and wanted a trial. None of that occurred. Instead, Manish advised the court that he agreed with the settlement terms and wanted them enforced.

¶ 51    Manish's counsel argued that it presented three contractual defenses to this case. Starting with duress, counsel claimed that the change in positions from requesting maintenance to no longer requesting maintenance was a drastic change that amounted to duress. He then addressed the amount and duration of maintenance to which Manish was entitled. He further argued that the decline in health of Manish's father also amounted to duress and therefore, the oral settlement agreement should not be enforced.

¶ 52    Manish's counsel also argued that the agreement was unconscionable stating that while the 60/40 split looked good on paper, it was no bargain for Manish because he would have received

15

substantially more, almost $1.5 million more, with a 50/50 split and maintenance. Further, he would have no tax consequence with the maintenance unlike the other financial assets.

¶ 53    Manish's counsel also argued that the agreement was vague and ambiguous to such extent that it could not be said there was a meeting of the minds. He stated that Manish never saw Exhibit A prior to the oral recitation, and he would never have agreed to split the Charles Schwab account because that was all nonmarital. Counsel also argued the agreement was vague because there was no allocation of debts. As to Exhibit A, counsel stated that even if the court allowed for enforcement of the agreement, inclusion of the exhibit was wrong and the parties should be allowed to "fight it out and figure out what assets *** are out there, and if they can't figure it out, we'll be back in court, and have the court decide what assets" each party owns. Finally, Manish's counsel stated that if the settlement was going to be enforced, the written document should be a judgment, not an MSA because his client would not voluntarily sign an MSA.

¶ 54    Following closing arguments, the court indicated that it considered the evidence, testimony, and credibility of the parties and stated, credibility was "certainly a key factor in this ruling." The court continued:

"There are some presumptions that have been made and a lot of reference to the maintenance statute and the—and the emphasis on 504(B), but it ignores all of 504(A), which says the court shall first make a finding as to whether a maintenance award is appropriate, after consideration of all relevant factors. Now I'm not going to fall down the temptation of the rabbit hole that I think that our respondent wants me to go, which is to try the case again through this hearing.

There was an opportunity to try the case. Court made itself available, made its court calendar more than available to do so. I made myself available to facilitate whatever the

16

parties wanted, whether it was a settlement or not. In fact[,] we went through the effort and the method by which to go into the courtroom and put the settlement agreement on the record with me asking not just the attorneys, and there was no dispute, and no evidence ever presented that Ms. Martinkus did not have the authority to speak on behalf of the respondent to make any agreement.

But yet I still went and spoke to each party and asked if—is this the agreement that you understand it to be? The respondent, yes. Resolve all these matters? Yes. Including the waiver of maintenance? Yes. All right, and you do so freely and willingly? Yes. And this is the order you want the court to enter and enforce if necessary? Correct, yes. There was never any indication that he couldn't even hear me at any point in time during that.

So that's also a factor in terms of credibility that's present here. *** [B]oth parties had the benefit of competent counsel that have appeared before this court over and over again. And they are officers of the court. And in fact[,] in this situation[,] we had extensive testimony from Ms. Martinkus, which I find credible.

As to the basis of that Mr. Dempsey has ably put forth in terms of outlining for the court in terms of duress, court finds that the respondent hasn't met his burden of proof. Even in his own testimony he contradicts himself. *** [T]hat's a credibility issue, and a problem just right there alone.

But that's not the main part of all this. Regardless I am going to grant the motion to enforce settlement. I'm denying the objection. *** [I]t's clear that the respondent agreed to the settlement, *** Even today he's saying, I still don't know what assets there were in India. *** So[,] when you find them out it's 60/40, it's a real easy split there. Being

17

unconscionable, unconscionable, I find it to be fair and equitable. *** so that burden of proof hasn't been met."

¶ 55    The court then asked what the parties intended to do with the settlement—whether an MSA would be signed or if a judgment was necessary. Shruti's attorney said she would prepare either document but believed Manish's attorney would require a judgment. Manish's attorney stated, "My suggestion would just be to prepare a judgment and send it to the court, and if the court feels it accurately reflects what's in the agreement, the court enter it."

¶ 56    After the parties disputed what should be contained in the judgment, the court stated,

"I would caution against any game-playing relative to my rulings and what I've heard today. It's in every single marital settlement agreement we don't necessarily specify to the penny when we say we're going to split something in a certain way, whether equally or 60/40. *** I would suggest some reasonableness and move this matter forward because at this point it seems like delay is not the chief goal here, it's to move this matter forward for both parties so they can move on to the next chapter of their lives."

¶ 57    The parties returned on September 15, 2021, after the judgment of dissolution was prepared. Manish's attorney objected to the proposed judgment stating the document went beyond the oral recitation by adding terms and provisions that embellished the agreement after the fact. He stated that any time frames orally stated at the April 28, 2021, hearing, should be based on the date of the judgment, not the date the agreement was recited to the court.

¶ 58    Manish's counsel also argued that paragraphs D and E included additional information that was not addressed during the recitation of the agreement to the court. Paragraph D awarded each party the personal property in his or her possession, and paragraph E, which dealt with the parties' vehicles, added language that placed responsibility for any vehicle debt on the party who received

18

the vehicle and further required the party receiving the vehicle to hold the other party harmless. Manish's counsel further argued that the valuation of the financial assets should be valued as of the date of the judgment, not the date of the oral recitation. He objected to Exhibit A being attached to the judgment and the inclusion of the Charles Schwab account in the 60/40 division because it was nonmarital property.

¶ 59   Following counsel's argument, the trial court went to paragraph D, which awarded the personal property in each party's possession, and asked Manish's counsel what his client's desire was with that issue. Manish's counsel stated that the parties continued to live in the same home and were "going to have to come to an agreement on that issue." The court asked if it was Manish's intent to quibble over every piece of personal furniture, and his counsel replied, "I hope not, but I don't know." The court asked if the personal property involved substantial assets as opposed to another $900 argument in a $4 million estate, asking Manish's counsel, "Is there some personal property that's of substantial value that is not immaterial to the context of this case?" Manish's counsel replied, "No, I don't know that there's going to be a dispute." The court then asked for proposed language from Manish's counsel and asked if he was suggesting that all the personal property be sold and split 60/40. Manish's counsel stated, "No. It's my understanding that there may be an agreement upon that *** but I don't know about that."

¶ 60   Thereafter, the trial court stated the following regarding the personal property language:

"Not only did the respondent have the benefit of an extensive hearing regarding objections to a settlement agreement which the Court found he clearly assented to, even with my asking the parties directly [if] any personal property is negligible in the context of a four million dollar plus estate, and I asked today even whether there are some significant personal property assets that are in dispute like some priceless oil painting or art collection

19

or something along those lines, but it seems like that that's not present. So[,] I'm overruling the objection and leaving paragraph D in."

Regarding the debt language, the court stated, "Since there was no mention of it, and there still is no outline or testimony regarding debts or obligations, I'm overruling the objection and leaving that language in."

¶ 61    With regard to Exhibit A, the court stated that it was going to allow that exhibit to "remain attached, and the valuation date should be April 28th, the date of the agreements agreed to fully and willingly in court that date." Thereafter, the trial court entered the judgment of dissolution.

¶ 62    The judgment of dissolution, *inter alia*, barred the parties forever from seeking maintenance. The parties' home was to be sold and split 60/40. Each party was awarded the personal property in their possession. Each received their automobiles. Except for $113,758 in the Chase account, all financial assets would be split 60/40 with Manish receiving 60% and Shruti receiving 40%. Manish was required to provide three years of records related to his Fidelity 401k, Shruti would sign documents to liquidate the Axis account in India, the parties would divide the gold, and the parties would sign all documents necessary to effectuate the split.

¶ 63    On October 15, 2021, Manish filed a motion to reconsider or modify. The motion claimed the judgment of dissolution did not accurately reflect the oral agreement recited to the court on April 28, 2021. The pleading further claimed the Charles Schwab account should not be divided because it was Manish's nonmarital property and proceeded to address Manish's testimony regarding the liquor store proceeds. The pleading further argued that the parties did not agree that the valuation date for the division would be the date of oral agreement. He argued that by using April 28, 2021, as the valuation date, Shruti was permitted to keep all income and property acquired between April 28, 2021, and September 15, 2021, despite that being marital property

20

subject to equitable division. He further stated that by attaching Exhibit A to the settlement agreement it would be made part of the agreement and division of the personal property was not addressed in the oral recitation. Finally, Manish contended that the trial court erred by finding the oral recitation was not too vague, ambiguous, or uncertain to constitute a valid oral contract and further erred by failing to find the oral agreement was not the product of duress and was not unconscionable.

¶ 64    On January 31, 2022, the trial court reiterated his previous credibility findings, specifically finding that Ms. Martinkus's testimony about Exhibit A was credible, and Manish's denials were not. The court further found any delay in valuation was caused by Manish and denied the motion to reconsider in its entirety. Manish timely appealed.

¶ 65                                II. ANALYSIS

¶ 66    Although not mentioned by Manish, this appeal stems from the denial of Manish's motion for reconsideration. "The purpose of a motion for reconsideration is to inform the trial court of (1) newly discovered evidence previously unavailable at the time of the original hearing, (2) changes that have occurred in the law since the original hearing, or (3) errors in the court's earlier application of the law." *Weidner v. Midcon Corp.*, 328 Ill. App. 3d 1056, 1061 (2002).

¶ 67    Typically, "[w]hether to grant a motion for reconsideration is a matter of discretion for the trial court, and its decision will not be overturned absent an abuse of discretion." *Id.* However, when a motion for reconsideration merely recites prior arguments, it should not be granted. *Id.* As Manish's reconsideration simply readdressed the arguments previously presented in the original objection, the trial court's denial of the reconsideration must be affirmed, and therefore we shall only address the trial court's findings appealed by Manish.

¶ 68    On appeal, Manish contends that the trial court (1) erred when it incorporated the parties'

oral settlement agreement into a judgment of dissolution despite Manish's objections to the oral

settlement agreement prior to the entry of judgment; and (2) erred by entering a judgment of

dissolution that added terms not included in the oral settlement agreement. We shall first determine

whether there was a valid contract and then determine whether the written judgment correctly

incorporated the terms of the oral settlement.

¶ 69                              Validity of Oral Settlement

¶ 70    A settlement agreement is a contract governed by principles of contract law. *Solar v.

Weinberg*, 274 Ill. App. 3d 726, 731 (1995). Oral settlement agreements are enforceable if there is

an offer, an acceptance, and a meeting of the minds between the parties regarding the terms of the

agreement. *Johnson v. Hermanson*, 221 Ill. App. 3d 582, 584 (1991). A meeting of the minds is

found whenever the parties' conduct objectively indicates an agreement to the terms of the

settlement, even if one or more of the parties did not subjectively intend to be bound. *Urban Sites

of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 51.

¶ 71    Whether a contract exists, its terms and the parties' intent are questions of fact to be

determined by the trier of fact, and an appellate court will not reverse the judgment unless it is

contrary to the manifest weight of the evidence. *In re Marriage of Gibson-Terry*, 325 Ill. App. 3d

317, 322 (2001); *Webster v. Hartman*, 309 Ill. App. 3d 459, 460 (1999); *In re Marriage of Baecker*,

2012 IL App (3d) 110660, ¶ 25. A finding regarding the validity of a settlement agreement is

against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or

where a decision is palpably erroneous and wholly unwarranted. *Kulchawik v. Durabla

Manufacturing Co.*, 371 Ill. App. 3d 964, 969 (2007).

22

¶ 72    On appeal, Manish first contends that the property settlement could not be concluded by an oral agreement due to the parties' substantial financial assets and the length of the marriage. This argument was never presented to the trial court. An argument cannot be considered on appeal where it was never raised by the appellant in the trial court. *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 121 (2004). As such, this argument is forfeited.

¶ 73    Manish next contends that he diligently challenged the oral settlement agreement before a judgment was entered; however, the argument presented claimed "the parties' marriage was not the kind of marriage that could be concluded through an oral agreement hastily conceived shortly before it was recited to the trial court on April 28, 2021." As this argument is similar to the initial argument and was never presented to the trial court, it too is forfeited. *Id.*

¶ 74    Manish also argues that the trial court erred by enforcing the oral settlement agreement when the terms were vague because the settlement was "hastily conceived" and "remarkably lacking in detail" as the oral agreement failed to address how the parties would divide the personal property or debts, and failed to specify which "retirement assets, cash, and investments, [were] subject to the 60/40 division." We disagree.

¶ 75    First, the evidence fails to support Manish's claim that the oral settlement was "hastily conceived." Both Ms. Martinkus's testimony and Manish's testimony revealed three days of settlement negotiations took place before the agreement was presented to the trial court on April 28, 2021. Reviewing courts have upheld oral settlement agreements when the parties negotiated "over a lunch break" (*In re Marriage of Gibson-Terry*, 325 Ill. App. 3d at 326), for two hours (*In re Marriage of Steadman*, 283 Ill. App. 3d 703, 710 (1996)), or simply on the morning trial was set (*In re Marriage of Haller*, 2012 IL App (5th) 110478, ¶¶ 4, 35-36). No argument was presented why three days was insufficient to negotiate the pending issues between the parties. As

such, we find the record fails to support Manish's claim that the settlement agreement was "hastily contrived."

¶ 76    Nor does the evidence support Manish's claim that the settlement agreement was "remarkably lacking in detail." An oral agreement that failed to contain either language addressing a nonexistent item, or an immaterial term, fails to establish the agreement was "remarkedly lacking in detail." See *First National Bank of Oak Lawn v. Minke*, 99 Ill. App. 3d 10, 14 (1981) (a lack of nonessential details will not render the contract unenforceable). Here, the record fails to support the contention that marital debt and the personal property were material terms of the agreement.

¶ 77    As to the parties' debts, none of the financial statements listed any marital debt, and Manish's prior counsel testified that the parties had no debt. The agreement was therefore not lacking in detail based on nonexistent debt.

¶ 78    As to the personal property, the record is clear that the parties were focused on their most valuable assets which included the financial accounts and the marital residence. The only remaining assets listed on the financial affidavits were the parties' two vehicles, and they were addressed during the oral recitation. Given the lack of information regarding any other property, the trial court could have properly inferred that any other property was not a material term of the settlement. Supporting such inference is the lack of testimony or evidence regarding the personal property. Despite Manish testifying on both days during the hearing on the motion to enforce, at no time did Manish provide any information, testimony, or evidence regarding the personal property or why the failure to address the alleged personal property during the oral recitation was error. In fact, Manish's own counsel conceded that no specific object was desired by his client or had a significant value requiring consideration by the court. Here, the record lacks any evidence that the parties' personal property was essential, material, or even had calculable value. As such,

24

we cannot find that the trial court's enforcement of the oral agreement, despite not addressing personal property, was error.

¶ 79 Nor does the record support Manish's contention that the oral contract was vague because it was insufficiently specific regarding the financial assets. Ms. Martinkus's recitation stated the agreement involved "all issues" specifically including the parties' "retirement assets, cash assets, and investments." The parties' financial affidavits listed their financial assets, and we note that all of the assets, for which values were provided, were included on Exhibit A. Manish's counsel testified that she used Exhibit A when she discussed the assets with Manish as well as when she was reciting the oral agreement. She further testified that prior to the recitation, all the parties— including Manish—were aware of what assets were contained on Exhibit A and were aware the exhibit would be included in the written settlement agreement.

¶ 80 While Manish claims he never saw Exhibit A prior to the recitation of the settlement agreement and was unaware the Charles Schwab account was included in the assets, such contentions were controverted by Ms. Martinkus's testimony, which the trial court unequivocally found more credible. "[A] reviewing court will not disturb the trial court's determination of credibility because the trial court has a superior vantage point, which cannot be reproduced from the cold record, to observe and judge the witnesses' demeanor and credibility." *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991).

¶ 81 Manish further claims the oral settlement agreement was too vague to be enforced because even if Exhibit A was accepted, it failed to address Shruti's Indian assets. This argument is also rebutted by the record. Manish testified that Shruti's Indian assets provided the dividends that were deposited in the Axis bank account. The oral agreement provided for division of the Axis account

as well as liquidation of the brokerage account linked to the Axis account. The record is devoid of any evidence that Shruti held any asset that did not deposit dividends into the Axis account.

¶ 82    In sum, there was either no evidence supporting, or evidence directly contradicting, Manish's claims that the oral agreement was vague because it was hastily contrived, remarkably lacking in detail, or insufficiently specific regarding the financial assets. As no opposite conclusion is apparent, we find that the trial court's determination that the oral agreement was not vague is not against the manifest weight of the evidence.

¶ 83                                   Unfairness or Inequity

¶ 84    Manish also argues that the trial court erred by enforcing the oral settlement agreement because it was neither fair, nor equitable, to award Shruti any portion of the Charles Schwab account as that was his nonmarital property. First, he claims the 60/40 division as pronounced in the oral recitation related solely to the marital assets and therefore did not include the Charles Schwab account. Manish's claim is controverted by the record which reveals the recitation addressed both the marital and nonmarital assets as Manish was granted over $100,000 from the Chase account as a nonmarital asset. Further, the evidence revealed that the Charles Schwab account was jointly titled for over 20 years. Such title presumes the property was marital property. *In re Marriage of Olson*, 96 Ill. 2d 432, 439 (1983).

¶ 85    Manish contends that he presented clear and convincing evidence rebutting the presumption that the Charles Schwab account was marital at the hearing on the motion to enforce the settlement. However, the issue at that hearing was whether the parties entered into a valid oral settlement agreement on April 28, 2021. Neither during the oral recitation by Manish's counsel, nor when the court queried Manish as to whether he agreed with the recitation, did Manish express confusion, or request clarification, regarding the classification of the Charles Schwab account as

marital property. Nor would any confusion be expected when Manish admitted his prior counsel *always* classified that account as marital property and the sole exception, due to a nonmarital classification, recited to the court was the Chase bank account.

¶ 86     All of Manish's testimony regarding the Charles Schwab account was information Manish held both prior to, during, and after, the time of the settlement. The fact that Manish later found counsel who advised him the account could have been classified differently does not change the fact that Manish voluntarily and willfully agreed with a 60/40 division of all the financial assets, except the Chase account, when the court questioned him regarding his acceptance of the terms of the settlement. See *Filko v. Filko*, 127 Ill. App. 2d 10, 17-18 (1970) (where a party already consented to terms of settlement in open court, that party cannot change their consent merely by changing attorneys).

¶ 87     Manish next claims the trial court erred by enforcing the parties' settlement agreement because the agreement was uncertain, lacking in essential terms, and therefore not binding on the parties. Once again, Manish contends that the failure to address the parties' debts or their personal property during the oral recitation renders the contract unenforceable because there was no meeting of the minds on those subjects. However, as noted above, the parties had no debt and there is no evidence that the parties' personal property was material.

¶ 88     Here, Manish also claims that his testimony about joint income tax liability based on the rupee dividends in the Indian account set forth on Form No. 16A (Exhibit 5) revealed marital debt. We disagree. Upon review of the exhibit, and contrary to Manish's contention, the document is not a statement of debt. The document is a certified statement from the Indian government revealing that it had already deducted the amount of tax due on the dividends from the bank account at issue and thereafter deposited the tax payment in the government bank account on or

27

before July 7, 2020. The document does not reveal debt; it reveals payment of the debt. As such, this argument fails to alter our previous conclusion regarding the alleged marital debt.

¶ 89    Manish further argues that the trial court's enforcement of the settlement was unfair and inequitable based on his waiver of maintenance and the amount he would have received had he not waived maintenance. We find this argument both presumptuous and speculative. As noted by the trial court, Manish's argument is premised on the language in section 504(b-1) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/504(b-1) (West 2020)) and ignores the language in section 504(a) (*id.* § 504(a)). Section 504(b-1) provides the calculations associated with the amount and duration of maintenance. *Id.* § 504(b-1)(1)(A), (B). Section 504(a) lists 14 factors to assist the trial court in determining whether an award of maintenance is even appropriate. *Id.* § 504(a)(1)-(14). There is no evidence in the record that the trial court would have found an award of maintenance appropriate after review of the statutory factors. As such, we find this argument has no merit.

¶ 90    Nor do we find Manish's arguments that it would have been more proper to (1) attribute 60% of the marital debt to Shruti, (2) provide him with 60% of the personal property, as opposed to the 50%, because he waived maintenance, and (3) that the failure to recite each financial asset caused the agreement to be so "uncertain" that it was not binding to have merit. For a contract to be enforceable, "the material terms must be definite and certain, meaning that the court is enabled from the terms and provisions, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *In re Marriage of Haller*, 2012 IL App (5th) 110478, ¶ 26. Here, the oral recitation stated the settlement was on "all issues" and then provided the material terms of the agreement. There was no evidence of debt, or that the parties' personal property was of significant value. Further, the credible testimony confirmed that Exhibit

28

A, which clearly delineated the Charles Schwab account as a joint marital asset, was reviewed by the parties and all agreed it would be attached to the settlement. Under such circumstances, and the specific language used during the oral recitation, the requirements for an enforceable contract are met.

¶ 91　　In sum, Manish's claims are either directly rebutted by the record, controverted by testimony of his prior counsel—who was found more credible, or have no support in the record. As such, we cannot find that the trial court's conclusion that the settlement was not unfair or inequitable because it was vague, or failed to include material terms, was against the manifest weight of the evidence.

¶ 92　　　　　　　　　　　　　　　　Duress

¶ 93　　Manish also contends the trial court erred when it enforced the agreement because the agreement was the product of duress. "Duress has been defined as a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of his free will ***." *Kaplan v. Kaplan*, 25 Ill. 2d 181, 185 (1962). "Acts or threats cannot constitute duress unless they are wrongful," and include acts "that are wrongful in a moral sense." *Id*. at 186. "[T]he threat must be of such nature and made under such circumstances as to constitute a reasonable and adequate cause to control the will of the threatened person, and must have that effect, and the act sought to be avoided must be performed by the person while in that condition." (Internal quotation marks omitted.) *Id.*

¶ 94　　Here, Manish argues that the record demonstrates that he was "subjected to extreme pressure to settle the case." He claims he "was left with the impression that he had no choice in the matter except to accept the settlement that was recited to the court" because the agreement was completed only minutes before the settlement agreement was announced to the court. However, as

29

noted above, it is undisputed that the parties negotiated the settlement, at arm's length with their attorneys, for three days before the settlement was announced.

¶ 95    Manish also claims that his father's illness, coupled with his counsel's statements that the judge did not like him, created a level of stress greater than other litigants and "these factors all combined to impair" his "free will to reject a hastily conceived settlement." However, Manish fails to explain how his stress was different, or greater than, that of other litigants. Stress is common in dissolution proceedings and stress alone is insufficient to establish duress or coercion. *In re Marriage of Flynn*, 232 Ill. App. 3d 394, 401 (1992). Nor does Manish address Ms. Martinkus's testimony that (1) controverted Manish's claims about what she said to him following the prehearing conference with the judge, (2) stated that despite his father's illness, Manish never asked to continue the negotiations, and (3) stated Manish acted in a manner that gave no indication that his father's illness affected him. As noted above, the trial court found Ms. Martinkus's testimony credible.

¶ 96    Manish also argues that he was under duress because his attorney refused to provide a written settlement agreement. Again, Manish's claim is contradicted Ms. Martinkus's testimony that indicated Manish never requested a written copy of the agreement before the agreement was recited to the court. Further, Manish was in the courtroom when his attorney read the agreement into the record. When questioned about the agreement by the court, Manish did not express concern regarding any of the terms or ask to wait until the agreement was in writing. Instead, he advised the court that he was in agreement with the recited terms and wished to be bound by them. While Manish contends that he was "bereft of the quality of mind necessary to make the agreement," the contention is undermined by Manish's admission during the enforcement hearing that he was

30

aware of the agreement terms that were going to be recited to the court; he was just "not in the mood" to make "choices at that time."

¶ 97    A party's change of heart or second thoughts regarding an agreement fails to affect the enforceability of the agreement. *In re Marriage of Baecker*, 2012 IL App (3d) 110660, ¶ 32; *In re Marriage of Stoker*, 2021 IL App (5th) 200301, ¶ 47. To hold otherwise would allow parties to change their minds at will, which would result in dilution of the binding effect of oral settlements. *In re Marriage of Lorton*, 203 Ill. App. 3d 823, 826 (1990). Given the evidence of record, we cannot find the trial court erred by enforcing the settlement because the terms were obtained under duress, as an opposite conclusion is not apparent.

¶ 98    For the above-stated reasons, we find the trial court's enforcement of the oral settlement was not against the manifest weight of the evidence. Therefore, we affirm the court's finding that the settlement was valid and enforceable.

¶ 99                                    Terms of the Judgment

¶ 100  Manish also argues that the trial court erred by entering a judgment of dissolution of marriage that added terms not included in the parties' oral settlement agreement. More specifically, Manish contends that the judgment of dissolution (1) directed the parties to pay their own debt and hold the other spouse harmless for said debt, (2) allowed for the inclusion of Exhibit A, (3) provided a valuation date of the property despite no such valuation date being addressed in the oral agreement, and (4) addressed a division of personal property beyond the financial assets. As many of these issues were previously addressed, we shall only briefly address them here.

¶ 101  We initially address the fact that, unlike the argument below, Manish now contends that the trial court's inclusion of additional language was *contrary to law* and cites statutes and case law in support thereof. Neither the argument nor the citations provided on appeal were presented

31

to the trial court. It is "axiomatic that questions not raised in the trial court are deemed waived and may not be raised for the first time on appeal." *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 500 (1985). The current argument, which includes aspects distinct from that raised below, is also waived. *Jeanblanc v. Sweet*, 260 Ill. App. 3d 249, 254 (1994).

¶ 102   The arguments presented by Manish before the trial court required the court to determine whether an oral contract existed, its terms and conditions, and the intent of the parties, which are all questions of fact determined by the trial court. *Emmenegger Construction Co. v. King*, 103 Ill. App. 3d 423, 427 (1982). The trial court's findings as to the terms of the settlement must be affirmed unless they are against the manifest weight of the evidence. *In re Marriage of Gibson-Terry*, 325 Ill. App. 3d at 322. A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or the findings appear unreasonable, arbitrary, or not based on the evidence. *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

¶ 103   As to the marital debt, none was listed on any of the five financial affidavits filed with the courts. While Manish contended that the Indian Form No. 16A was similar to an American W-2 and listed tax debt related to the dividends obtained on the Indian assets, we reviewed the exhibit and determined that it was not evidence of debt, it was evidence of debt already paid. As there is no evidence of any marital debt, the inclusion of language regarding debt in the judgment is superfluous, fails to alter substantive rights of the parties, and is of no merit. As such, inclusion of language addressing the parties' debt was not against the manifest weight of the evidence.

¶ 104   With regard to the inclusion of Exhibit A, the trial court heard conflicting testimony, and ultimately found the testimony of Ms. Martinkus—that stated the document was used during the settlement negotiations and the parties knew the document would be included in the written settlement—was more credible than Manish's testimony to the contrary. As the trial court was in

32

the best position to determine the credibility of the witnesses, we defer to the trial court's credibility ruling. *In re Marriage of Manker*, 375 Ill. App. 3d 465, 477 (2007). Here, we do not believe any document specifically listing the material assets, as an attachment to a judgment of dissolution, is improper when the parties' agreement covered "all issues," the assets set forth on the exhibit were identical to those set forth in the parties' financial affidavits, and the parties were aware that the exhibit would be attached to the MSA. As such, the trial court's inclusion of Exhibit A as an attachment to the judgment was not against the manifest weight of the evidence.

¶ 105   As to the valuation date, it is clear upon review of the oral recitation that the parties advised the court that they wanted the settlement to immediately bind them. Counsel for both parties, as well as both Manish and Shruti, confirmed the terms of the agreement. Given these personal affirmations to the court, as well as Ms. Martinkus's testimony regarding Manish's providing the updated asset values found on Exhibit A during the settlement negotiations, we cannot find that the trial court's setting the valuation date to run with the oral settlement was against the manifest weight of the evidence.

¶ 106   Finally, we address the inclusion of the personal property language. Here, it is undisputed that although the settlement agreement was for "all issues," the oral recitation failed to address how the personal property would be divided. As noted above, we do not find the lack of information critical as the personal property was clearly not a material term of the settlement. While the court repeatedly questioned Manish, as well as his counsel, about this issue while trying to determine the intent of the parties, no proposed language on this issue was acceptable to Manish or his counsel. Instead, Manish's counsel inferred that the parties had already reached a settlement on this issue, which if true, moots this issue.

33

¶ 107   Regardless, no such agreement addressing the personal property is contained in the record. While the judgment language incorporates the parties' intent to settle all the issues, the language utilized fails to assist the parties in distributing the personal property if no subsequent agreement regarding distribution of their personal property was ever reached. Therefore, we find the trial court's inclusion of the language in paragraph D is unsupported by the record and against the manifest weight of the evidence. Therefore, the language is vacated, and we remand the case back to the trial court to determine whether settlement on this issue was reached, and if not, to provide the parties an opportunity to address distribution of the personal property owned at the time the oral settlement was reached.

¶ 108   As a final note, we admonish appellant, and his counsel, of the sanctions provided by Illinois Supreme Court Rule 375(b). Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994). An appeal is frivolous, and therefore warrants sanctions or there are grounds for sanctions, when (1) it is not reasonably well-grounded in fact, (2) it is not warranted by existing law, (3) it is not a good faith argument for the extension, modification, or reversal of existing law, or (4) a reasonable attorney would not have brought the appeal. *Enbridge Pipeline (Illinois), LLC v. Temple*, 2019 IL App (4th) 150346, ¶ 64. An appeal not taken in good faith can serve as grounds for sanctions when the primary purpose is to delay, harass, or cause needless expense. *Id*.

¶ 109   Despite this decision vacating one sentence of the judgment, we find the majority of Manish's contentions, and assertions on appeal, were arguably not brought in good faith because they were not reasonably well-grounded in the facts or the record in this case, and/or were brought with the primary purpose to delay, harass, and cause needless expense. Accordingly, we remind counsel, and caution his client, with regard to any future filings, that sanctions, including an award

34

of reasonable attorney fees and costs as a result of defending against a frivolous appeal, could be warranted, if it is found the filings were not made in good faith.

¶ 110                                   III. CONCLUSION

¶ 111   For the reasons stated herein, we affirm the trial court's finding that the parties' oral argument was valid and enforceable. We also affirm the trial court's judgment of dissolution except for paragraph D and remand the case back to the circuit court solely to allow the parties to address the distribution of personal property possessed as of April 28, 2021.

¶ 112   Affirmed in part and vacated in part; cause remanded.